CONNELL FOLEY LLP
Stephen V. Falanga, Esq. (SF-6414)
Philip W. Allogramento III, Esq. (PA-7796)
85 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-0500
*Attorneys for Creditor Lim Chew Corp.*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 7 |
| CIRCLE 10 RESTAURANT, LLC, | Bank. Case No.: 13-14820 (RG) |
| Debtor. | |

**OBJECTION OF LIM CHEW CORP. TO TRUSTEE'S MOTION TO SELL CLASS
C RETAIL PLENARY CONSUMPTION LIQUOR LICENSE BEARING
LICENSE NUMBER 0710-33-020-007 PURSUANT TO 11 U.S.C. § 363**

Lim Chew Corp. ("Lim Chew"), the  landlord and present creditor of the debtor

Circle 10 Restaurant, LLC (the "Debtor"), by and through its attorneys, Connell Foley LLP,

hereby files this objection (the "Objection") to the motion filed by Jay L. Lubetkin, Chapter

7 Trustee for the Debtor (the "Trustee") with respect to the Trustee's attempted sale of that

New Jersey Class C retail plenary consumption liquor license bearing license number 0710-

33-020-007 (the "Liquor License").

**PRELIMINARY STATEMENT**

Lim Chew has directly owned or controlled the Liquor License at issue for

approximately 40 years and it has been continuously associated with the real property

owned by Lim Chew located at 372 West Mount Pleasant Avenue, Livingston, New Jersey

07039 (the "Property") during that period.  In 2010, Lim Chew agreed to transfer the Liquor

1

License to the Debtor solely for purposes of facilitating the Debtor's restaurant operations at the Property in connection with Lim Chew's agreement to lease the Property to the Debtor.

At all points in time, Lim Chew and the Debtor understood that the Liquor License was intended to remain with the Property and was to be transferred back to Lim Chew at the end of the lease.  At no time was it ever intended by the parties that Lim Chew was transferring its ownership interest in the Liquor License to the Debtor separate and apart from the lease of Property (indeed, Lim Chew would not have transferred the Liquor License absent this understanding).  To memorialize and enforce this understanding, Lim Chew and the Debtor executed a Lease Agreement, Promissory Note and Right of First Refusal that required the Debtor to transfer the Liquor License to Lim Chew at an agreed-upon price upon, *inter alia,* the Debtor's ceasing its restaurant operations at the Property. Since the Trustee as no greater rights than the Debtor to the Liquor License, the Trustee is bound by the Debtor's pre-petition agreement requiring the Liquor License to be transferred back to Lim Chew.

Accordingly, for the reasons set forth herein, Lim Chew objects to the Sale Motion on the grounds that the Trustee lacks the authority to sell the Liquor License free and clear of Lim Chew's rights under its agreements with the Debtor.

## **FACTUAL BACKGROUND**

1.      Lim Chew is the owner of a certain piece of real property located at 372 West Mount Pleasant Avenue, Livingston, New Jersey 07039 (the "Property").

2.      The Property is zoned for commercial use and is presently outfitted for use as a restaurant.

2

3.      Lim Chew has owned the Property[1] for approximately forty years and, during that time, has either held title to a liquor license in connection with the Property or has granted its various restaurant tenants temporary use of the same for the duration of their respective leases.

**The Lease, Promissory Note and Right of First Refusal.**

4.      On or about, October 20, 2010, Lim Chew and the Debtor entered into a certain Lease Agreement (the "Lease") by which Lim Chew agreed, *inter alia*, to lease the Property to the Debtor for Debtor's operation of a restaurant at the Property.  The Lease was for an initial period of ten (10) years, with two subsequent options to extend the lease period for five (5) years.  A true copy of the Lease is attached hereto as Exhibit A.

5.      In connection with Lim Chew's agreement to lease the Property to the Debtor, Lim Chew also agreed to transfer the Liquor License to the Debtor, which Lim Chew did so solely for purposes of facilitating restaurant operations at the Property.

6.      As part of the agreement to transfer the Liquor License, the Debtor was required to pay Lim Chew an initial payment and thereafter make monthly payments pursuant to the terms of a certain promissory note (the "Promissory Note").  In particular, the Promissory Note provided for Debtor to make an initial payment of One Hundred Thousand Dollars ($100,000.00) (the "Liquor License Initial Payment") and make monthly payments of principal and interest in eighty-four (84) equal payments of $8,044.54.  A copy of the Promissory Note is attached hereto as Exhibit B.

---

[1] The Liquor License was actually tied to the Property even prior to Lim Chew's purchase as the prior owners operated a bar on the Property.  The fact that the Liquor License was tied to the Property was a major factor in Lim Chew's purchase of the Property.

2905812-05

7.      Under the terms of the Promissory Note (which was an exhibit to the Lease and incorporated by reference therein), upon a Event of Default, the Debtor was required to transfer the Liquor License to Lim Chew on agreed-upon terms and conditions.

8.      In addition, in connection with Lim Chew's agreement to lease the Property and transfer the Liquor License to the Debtor for the duration of this lease, the Debtor and Lim Chew also entered into a certain agreement styled Right of First Refusal Agreement ("Right of First Refusal") (when taken together with the Lease and the Promissory Note, the "Lease Agreement") which provided that should certain events occur – a "Triggering Event" -- the Debtor was required to transfer the Liquor License to Lim Chew on agreed-upon terms and conditions.   A true copy of the Right of First Refusal is attached hereto as Exhibit C.

9.      The Right of First Refusal defines a "Triggering Event" as whenever:

a.      [the Debtor] offers to sell the [Liquor License] to a third party (other than a Permitted Assignee, [as defined therein]);

b.      [the Debtor] receive[s] an offer following bona fide arms length negotiations from a ready, willing and able unrelated third party to purchase the [Liquor License] which offer . . . [the Debtor] desires to accept; or

c.      the Term of the Lease . . . expires or the Lease is terminated for any reason.

10.      The Right of First Refusal provides that should a Triggering Event occur, Lim Chew would be entitled to exercise the option to retake title to the Liquor License for the price of the *lesser* amount of:

a.   The Third Party Offer Price (if any),

4

    b.   the sum of . . . $100,000.00, and . . . the original principal amount payable under the Promissory Note . . . [(i.e., $500,000.00)], and

    c.   the sum of . . . $100,000.00, and . . . the total principal payments made by the [Debtor] under the [Promissory] Note through the date of the transfer of the [Liquor] License  . . ..[2]

    11.    The requirement that the Debtor transfer the Liquor License to Lim Chew upon termination of the lease of the Property or other Event of Default was a material precondition for Lim Chew's agreement to execute the Lease Agreement and transfer the Liquor License to the Debtor.  Lim Chew would not have agreed to lease the Property and transfer the Liquor License to the Debtor in the absence of the Debtor's obligation to transfer the Liquor License to Lim Chew at the conclusion of the Lease arrangement.

    12.    Following the execution of the Lease Agreement, the Debtor was granted possession of the Property as a tenant and, upon information and belief, transfer of title to the Liquor License from Lim Chew to the Debtor was approved by the Township of Livingston.

**Abandonment of the Property and Breaches of the Lease and Promissory Note.**

    13.    In or about December 2011, Lim Chew agreed that the Debtor could defer making three (3) monthly payments under the Promissory Note, with said payments to be added to the end of the payment schedule under the Promissory Note.

    14.    In or about April 2012, the Debtor began missing payments due to Lim Chew under the Promissory Note.

    15.    Thereafter, in or about September 2012, the Debtor unilaterally and without prior notice to Lim Chew, elected to close its restaurant operation at the Property and stopped making payments to Lim Chew under the Lease and Promissory Note.

---

[2] In essence, the formula provides for Lim Chew to repay the Debtor what it had actually paid to acquire the Liquor License from Lim Chew.

2905812-05

16.    The Debtor's actions and inactions resulted in various breaches/defaults under the terms of the Lease and Promissory Note.

17.    Despite written notice of its breaches/defaults, the Debtor failed to cure any of the breaches/defaults.

18.    Thereafter, in or about September 2012, the Debtor unilaterally and without prior notice to the Lim Chew elected to close its restaurant operation at the Property and stopped making payments to Lim Chew under the Lease and Promissory Note.

19.    The Debtor thereafter unilaterally chose to voluntarily vacate the Property in or about January 2013 but did not agree to transfer the Liquor License back to Lim Chew pursuant to the Lease Documents.

20.    As noted *supra*, the Lease Agreement provides that under certain circumstances, the Debtor is required to transfer the Liquor License to Lim Chew.

**Refusal of Debtor to Transfer Liquor License Back to Lim Chew**

21.    Upon abandonment of the Property, Lim Chew requested that the Debtor return the Liquor License to Lim Chew consistent with the Lease Agreement.

22.    Instead of complying with the terms of the Lease Agreement, the managing member of the Debtor, Neal Erman, refused to return the Liquor License to Lim Chew for the price previously agreed to in the Lease Agreement.

23.    Mr. Erman thereafter threatened to place the Debtor into bankruptcy unless Lim Chew agreed to pay a substantially higher price for the Liquor License than Lim Chew was otherwise contractually obligated to pay the Debtor.

2905812-05

24.    Upon information and belief, Mr. Erman sought to wrongly compel Lim Chew to pay an excessive price for the Liquor License so that he could apply the funds in excess of what was owed to the Debtor to other debts of the Debtor, including those debts of the Debtor that he personally guaranteed.

25.    Lim Chew ultimately refused to accept the terms sought by Mr. Erman.

**Declaration of Bankruptcy and Motion to Sell Liquor License**

26.    On March 8, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of title 11 of the United States Bankruptcy Code.

27.    On March 11, 2013, Jay L. Lubetkin was appointed as Chapter 7 Trustee of the Debtor's estate (the "Trustee").

28.    On April 11, 2013, the Trustee filed the Motion to Sell the Liquor License to Onyx on behalf of an entity to be formed for $500,000.00.

**LEGAL ARGUMENT**

**I.    THE TRUSTEE LACKS THE AUTHORITY TO SELL THE LIQUOR LICENSE FREE AND CLEAR OF THE DEBTOR'S OBLIGATION TO TRANSFER THE LIQUOR LICENSE TO LIM CHEW CORPORATION.**

29.    The Trustee should not be permitted to sell or otherwise transfer the Liquor License free and clear of the Debtor's obligation to transfer the Liquor License back to Lim Chew pursuant to the Lease Agreement.  At most, the Debtor possessed temporary legal title to the Liquor License for the duration of the existence of its restaurant operations at the Property owned by Lim Chew – a restaurant operation that has now ceased to exist --and a right to restore the Liquor License to Lim Chew when such operations end.

2905812-05

30.     While § 363 of the Bankruptcy Code generally permits a debtor to sell property "free and clear of any interest in such property . . .," this provision is not intended to replace state law and does not give a debtor the right to sell something that it does not have a right to sell outside of bankruptcy.  In *Butner v. United States*, 440 U.S. 48, 54 (1979), the Supreme Court emphasized that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." The Court then went on to instruct that: "Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.  Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy." *Id.* at 55, 99 S. Ct. at 918 (citations and internal quotations omitted). Accordingly, the *Butner* court concluded that absent a countervailing federal interest, "the basic federal rule is that state law governs." *Id.* at 57.

31.     Courts applying the *Butner* analysis have relied on its holding to conclude that a trustee in bankruptcy is bound by the same limitations as the debtor noting that "once a property interest has passed to the estate, it is subject to the same limitations imposed upon the debtor by applicable nonbankruptcy law."  *In re American Freight Sys., Inc.*, 179 B.R. 952, 960 (Bankr. D. Kan. 1995); *see also In re Transcon Lines*, 58 F.3d 1432, 1438 (9th Cir. 1995) (noting that "nonbankruptcy law defines the nature, scope, and extent of the property rights that come into the hands of the bankruptcy estate"), cert. denied sub nom. *Gumport v. Sterling Press, Inc.*, 516 U.S. 1146 (1996); *In*

*re Sanders*, 969 F.2d 591, 593 (7th Cir. 1992) ("[A] bankruptcy trustee succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition."); *In re FCX, Inc.*, 853 F.2d 1149, 1153 (4th Cir. 1988) ("The estate under § 541(a) succeeds only to those interests that the debtor had in property prior to commencement of the bankruptcy case."); *In re Bishop College*, 151 B.R. 394, 398 (Bankr. N.D.Tex. 1993) (holding that a bankrupt's estate receives trust assets "subject to any restrictions imposed by state law, pre-petition").

32.    The case of *In re The Ground Round, Inc.*, 482 F.3d 15, 18 (1st Cir. 2007) from the United States Court of Appeals for the First Circuit is on all fours with the case at bar.   In *Ground Round,* the Court of Appeals was confronted with the issue of a chapter 11 debtor attempting to sell a liquor license subject to a right of first refusal.  The First Circuit concluded that "the formal structure of a bona fide transaction is not lightly to be disregarded in bankruptcy" and found that while the debtor may have had legal title to the liquor license, it had an obligation to restore the license to the original holder of the same at the end of its lease.  *In re The Ground Round, Inc.*, 482 F.3d at 18; see also 11 U.S.C. § 541(d).  Applying equitable principals applicable in bankruptcy, the First Circuit focused on the substance of the transfer of the liquor license to the debtor, rather than the title ownership of the same, and found that the parties had always intended for the license to return to its original holder.  In so holding, the Court concluded that if the landlord had been allowed to do so under state law, the landlord would likely have structured the transaction as a lease of the liquor license rather than a sale.  482 F.3d. 21.

33.    In the case at bar, as in *Ground Round¸* the Debtor possesses (at most) temporary title to the Liquor License and is bound to return the Liquor License to Lim

Chew in accordance with the Lease Agreement.  The Debtor's ownership interest in the Liquor License was always conditioned upon its obligation to transfer the Liquor License back to Lim Chew upon conclusion of the its restaurant operations.  To find otherwise merely by action of the Debtor filing for bankruptcy would necessarily destroy the intentions of the parties to this Lease Agreement and would serve to convey a windfall upon the Debtor (and those who co-signed for certain of its debts) that it was never intended to possess.

34.      In the absence of a specific provision of the Bankruptcy Code overriding Lim Chew's right to repurchase the Liquor License, New Jersey law clearly provides that Lim Chew may specifically enforce the Debtor's obligation to transfer the Liquor License to Lim Chew under the Lease Agreement and a mere monetary damages claim is not sufficient.  *See Kalogeras v. 239 Broad Avenue, L.L.C.*, 202 N.J. 349 (2010) (holding that specific performance of an agreement to transfer a liquor license was proper and enforceable under New Jersey law).

35.      Accordingly, the Court should not permit the relief sought in the Sale Motion as the Trustee does not have the right to sell the Liquor License, an asset that it only holds subject to the rights of Lim Chew, free and clear of all claims and interests. Instead, the Trustee should transfer the Liquor License to Lim Chew pursuant to the terms and conditions of the Lease Agreement.

## II.     THE DEBTOR'S OBLIGATION TO TRANSFER THE LIQUOR LICENSE TO LIM CHEW CANNOT BE AVOIDED BY AUTOMATIC REJECTION UNDER §365(d)(1) .

36.      Neither the Right of First Refusal nor the Promissory Note (which both contain the requirement of the Debtor to transfer the Liquor License to Lim Chew) are

executory and, therefore, are not capable of rejection by the Trustee. Indeed, neither the Promissory Note nor the Right of First Refusal were identified by the Debtor as executory in nature on Schedule G of the Debtor's bankruptcy schedules. Therefore, the automatic rejection of executory contracts in chapter 7 cases under §365(d) cannot serve as the basis to deny Lim Chew its right to reacquire the Liquor License[3].

37.    The Third Circuit has defined an executory contract for purposes of § 365 as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (citations omitted); *see also In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 (3d Cir. 1995) ("Unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365."). "The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed." *In re Columbia Gas*, 50 F.3d at 240.

38.    Under the Promissory Note, the Debtor is obligated because of its default to transfer the Liquor License to Lim Chew. Upon the occurrence of, *inter alia*, a payment default under the Promissory Note or an Event of Default under the Lease, Lim Chew is immediately entitled to acquire the Liquor License on the same terms that the Debtor acquired it for under Section 2.4 of the Lease. In this case, the terms are simply that Lim Chew is permitted to acquire the Liquor License for what the Debtor paid for it

---

[3] Even if rejection of the Lease Agreement took place, the result should remain the same – Lim Chew should be permitted to have the Liquor License returned to it. The First Circuit in *In re Ground Round* noted that the chapter 11 debtor's rejection of the lease at issue also ended the debtor's contractual right to continued use of the liquor license. 482 F.3d 18.

2905812-05

and thereafter apply for the transfer to the ABC. The Debtor (in this case the Trustee) is required to do nothing more than accept payment.

39.     Similarly, with respect to the Right of First Refusal, case law provides that a right of first refusal is not an executory contract when no sale is pending at the time of the bankruptcy filing. *See In re Robert L. Helms Construction & Dev., Inc.*, 139 F.3d 702 (9th Cir. 1998); *see also In re Bergt*, 214 B.R. 17 (Bankr. D. Alaska 1999).

40.     Under New Jersey state law, a right of first refusal, or first right to buy, has been held to not be a true option, but rather a valuable prerogative. *Mazzeo v. Kartman*, 234 N.J. Super. 223, 229 (App. Div. 1989)(holding that a preemptive option to repurchase land was valid if exercisable within a reasonable time). It limits the right of the owner to dispose freely of his property by compelling him to offer it first to the party who has the right to buy. *Id*. Nor may the owner accept an offer made to him by a third party in violation of the right of first refusal.

41.     For example, in *Helms*, the debtor had granted the former owner of real property an option to buy back part of the property upon certain terms. The underlying bankruptcy court had ruled that the optionee's interest in the real property was executory and could be rejected in the seller's bankruptcy. *Helms*, 139 F.3d at 703. On appeal, the B.A.P. reversed the bankruptcy court's decision and held that the option was executory and explained that:

> . . . we look to outstanding obligations at the time the petition for relief is filed and ask whether both sides must still perform. Performance due only if the optionee chooses at his discretion to exercise the option doesn't count unless he had chosen to exercise it. An option may on occasion be an executory contract, for instance, where the optionee has announced that he is exercising the option, but not yet followed through with the purchase at the option price. The question thus becomes: at the time of filing, does

12

each party have something it must do to avoid materially breaching the contract?  Typically, the answer is no; the optionee commits no breach by doing nothing.  *Id*. at 706.

42.    In *In re Bergt*, which relied in part upon *Helms*, the bankruptcy court painstakingly examined the unsettled history of the treatment of rights of first refusal in bankruptcy and held that a right of first refusal in the possession of a non-debtor is no more than an unexercised option and could not be rejected by the debtor when, *on the date of the petition*, the party with the right of first refusal had no duties which it could fail to perform.  241 B.R. at 36.  *Bergt* therefore draws the bright line that if a right of first refusal is not triggered on or before the petition date by the existence of a potential sale, then neither party has any duties to perform and the right of first refusal cannot be considered executory.

43.    Here, on the Petition Date, the Debtor did not yet have a bona fide offer to purchase the Liquor License (i.e., no Triggering Event existed).  As such, under the terms of the Lease Agreement, neither the Debtor nor Lim Chew had any duty relative to the Right of First Refusal.  It was only after the Petition Date, when the Trustee had been appointed and had begun negotiating for the sale of the Liquor License, that the right of first refusal and its related obligations spring into life[4].

## CONCLUSION

44.    For the foregoing reasons, Lim Chew objects to the Trustee's Sale Motion and requests that the Court deny the relief requested.

CONNELL FOLEY LLP

---

[4] In an unpublished decision by the Appellate Division of the Superior Court of New Jersey, the Court, in addressing a waiver argument against enforcement of a right of first refusal, explained that until an auction actually took place, there was no "offer" to match and "no right to exercise" under the right of first refusal.  *Lacascata Homeowners Assoc., Inc. v. Riiff*, 2005 N.J. Super. Unpub. LEXIS 366 *1, 9.

2905812-05

85 Livingston Avenue
Roseland, N.J. 07068
(973) 535-0500
*Attorneys for Creditor Lim Chew Corp.*

By: /s/ Stephen V. Falanga

Dated: May 15, 2013                    Stephen V. Falanga (SF-6414)

2905812-05

# Exhibit A

# LEASE AGREEMENT

by and between

Lim Chew Corp.

as Landlord

and

Circle 10 Restaurant LLC

as Tenant

October 10, 2010

2377438-08

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made this October 10 , 2010, by and between Lim Chew Corp., a New Jersey corporation ("Landlord"), and Circle 10 Restaurant LLC, a New Jersey limited liability company ("Tenant").

## ARTICLE 1
## TERMS, OTHER DEFINITIONS

1.1    **Basic Lease Terms**. The following are the basic terms of this Lease:

(a)    "Landlord": Lim Chew Corp., a New Jersey corporation

(b)    Landlord Address: 276 Eisenhower Parkway, Livingston, New Jersey 07039

(c)    "Tenant": Circle 10 Restaurant LLC

(d)    Tenant Address:  8 Tarlton Drive, Livingston, NJ 07039

(e)    "Tenant's Trade Name": Tio Juan's Margaritas Mexican Restaurant

(f)    "Initial Lease Term": Commences on the Commencement Date and extends until the expiration of ten (10) full Lease Years from the Rent Commencement Date.

(g)    "Extension Term(s)": two (2) consecutive periods of five (5) years each.

(h)    "Commencement Date": The date of delivery of possession of the Premises to Tenant.

(i)    "Base Rent":

| Year | Base Rent per Lease Year |
|------|--------------------------|
| 1 | $153,000.00 |
| 2 | $180,000.00 |
| 3 | $180,000.00 |
| 4 | $183,600.00 |
| 5 | $187,272.00 |
| 6 | $191,017.00 |
| 7 | $194,838.00 |
| 8 | $198,735.00 |
| 9 | $202,709.00 |
| 10 | $206,763.00 |

2377438-08

"Option Extension Rent":

| Years | Base Rent per Lease Year |
|-------|--------------------------|
| 11 | $210,899.00 |
| 12 | $215,117.00 |
| 13 | $219,419.00 |
| 14 | $223,807.00 |
| 15 | $228,284.00 |
| 16 | $232,849.00 |
| 17 | $237,506.00 |
| 18 | $242,256.00 |
| 19 | $247,101.00 |
| 20 | $252,043.00 |

(j)    "Additional Rent": Pursuant to Article 4.

(k)    "Premises": Block 600 Lot 1 of the Tax Map of the Township of Livingston, commonly known as 372 W. Mt. Pleasant Avenue, Livingston, New Jersey 07039, as more particularly described and/or depicted on Exhibit A.

(l)    "Security Deposit": 2 months rent pursuant to Section 4.5.

(m)    "Lease Interest Rate": The prime rate announced, from time to time, by JPMorgan Chase Manhattan Bank, N.A. (or a similar institution if JPMorgan Chase Manhattan Bank, N.A. is not then in existence) plus ten (10%) percent.

(n)    "Rent Commencement Date": The first to occur of (i) the date when food is first sold from the Premises, and (ii) the date when a certificate of occupancy or certificate of continued occupancy is issued for substantially all of the Premises, but in any event the Rent Commencement Date shall occur not later than one hundred and eighty (180) days from the date first written above.

1.2.    **Significance of Basic Lease Terms.** These Basic Lease Terms are qualified by the specific provisions contained in the following pages of this Lease. Whenever the term 'rent' shall appear in this Lease, such term shall mean Annual Base Rent, Additional Annual Rental and all other payments that Tenant is required to pay hereunder. There are other defined terms contained in this Lease, and they shall have the respective meaning as described herein.

Page 3 of 36

2377438-08

**1.3**    **List of Exhibits**

Exhibit A        Description/Depiction of the Premises

Exhibit B        Form of Promissory Note for Liquor License

## ARTICLE 2
## PREMISES AND LICENSE

**2.1    Premises.** From and as of the Commencement Date, Landlord, for and in consideration of the rents, agreements and conditions required to be paid or to be performed by Tenant, rents and leases to Tenant, and Tenant takes and receives from Landlord the Premises. Tenant has inspected the Premises and agrees: (i) to accept possession of the Premises in its "as is" condition existing on the Commencement Date, (ii) that neither Landlord nor Landlord's agents have made any representations or warranties with respect to the Premises except as expressly set forth herein, and (iii) Landlord has no obligation to perform any work, supply any materials, incur any expense or make any alterations or improvements to the Premises to prepare the Premises for Tenant's occupancy. Tenant's occupancy of any part of the Premises shall be conclusive evidence, as against Tenant, that Tenant has accepted possession of the Premises in its then current condition, and the Premises is in the condition required by this Lease.

**2.1A    Basement Premises.** Landlord and Tenant acknowledge and agree that Tenant is not permitted to use the basement level of the building located on the Premises (the "Basement") for restaurant seating, bar service or otherwise as space open to customers or the general public and that in no event shall Tenant permit customers of Tenant or the general public access to the Basement except during such time as Tenant shall be paying the Basement Rent (as defined below) to Landlord and as may be permitted by applicable Laws (as defined below). In the event that Tenant desires to use any portion of the Basement for restaurant seating, bar service or otherwise to permit access thereto or use thereof in any manner by customers (such area, the "Useable Basement Area"), Tenant shall submit a plan to Landlord for Landlord's approval depicting the portion of the Basement proposed to be so used, including square footage of such area, which use and any work or alterations associated therewith shall be subject to all other terms and provisions of this Lease (including receipt of all necessary governmental approvals and compliance with all Laws (as defined below)). Tenant shall pay Basement Rent in equal monthly installments which shall be added to and considered part of the Base Rent and subject to all terms and conditions applicable to Base Rent. Annual rent for the Useable Basement Area ("Basement Rent") shall be equal to forty percent (40%) of the product of: (x) the number of square feet in the Useable Basement Area, and (y) the amount of Base Rent payable pursuant to Section 1.1(i) above divided by 9,000. Basement Rent shall be recalculated any time the Useable Basement Area increases or Base Rent increases pursuant to this Lease to reflect such increases. For the avoidance of doubt, Tenant shall be permitted to use the Basement for any purpose related to the restaurant business other than the provisions of front of house services to customers or the general public, including without limitation, storage, office space or the performance of back of the house services, in any case, without further approval from Landlord and without payment of the Basement Rent.

    **2.2    Use - Restaurant Operations.** Tenant shall use the Premises solely for the purpose of conducting restaurant operations. Tenant shall continuously and uninterruptedly use, occupy and operate the Premises during the entire term of this Lease with due diligence and efficiency and in a high grade and reputable manner. Tenant shall provide adequate personnel and shall carry at all times in the Premises a full and complete stock of inventory sufficient to operate the Premises in a first-class manner. Any activities by Tenant upon the Premises unrelated to the restaurant business are prohibited without the express consent in writing by Landlord. Tenant shall comply at is sole cost and expense with all applicable rules and regulations governing refuse removal and recycling in, on and from the Premises.

    **2.3    Parking.** Throughout the Lease Term, Tenant will have (and may make available to its suppliers, employees, customers, and contractors in connection with the operation of the restaurant) the exclusive right to use the parking areas located on the Premises, provided that the same may be used at any time by emergency vehicles or by Landlord in connection with and/or in the performance of alterations, additions, inspections, maintenance, repair, and replacement of the Premises, if any.

    **2.4    Liquor License.** (a) In consideration of Tenant's payment of a purchase price in the amount of $600,000.00 (the "Purchase Price") Landlord agrees to sell and Tenant agrees to purchase the New Jersey Alcoholic Beverage Retail Consumption Liquor License issued by the Township of Livingston, Essex, New Jersey and designated as License No. 0710 - 33 - 020 – 005 (the "Liquor License"), subject to receipt of all necessary governmental approvals. The Purchase Price shall be paid in two (2) parts, (i) One Hundred Thousand ($100,000.00) (the "Liquor License Initial Payment"), and (ii) the remainder by Tenant's execution of a Promissory Note to Landlord in the form attached hereto as Exhibit B (the "Note") in the principal amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00), which Note shall be payable as provided therein beginning on the Rent Commencement Date, which payments shall constitute Additional Rent for all purposes under this Lease. Tenant shall have the right to prepay the Note on the terms set forth in the Note. Simultaneously with the execution of this Lease, Tenant shall (x) pay into the attorney trust account of Landlord's attorney, Connell Foley LLP (the "Escrow Agent"), the Liquor License Initial Payment, and (y) make and deliver to Landlord's attorney, in escrow, the Note. Upon approval of the transfer of the Liquor License to Tenant by the Township Council of the Township of Livingston, Landlord's attorney shall release from escrow and deliver the Liquor License Initial Payment and the Note to Landlord. If the transfer is not approved within the Liquor License Approval Period (as defined below) and Tenant withdraws its application for Liquor License Transfer Approval, Landlord's attorney shall return the Liquor License Initial Payment and the Note to Tenant.

    (b) Landlord will cooperate with Tenant in complying with the regulatory or governmental procedures or requirements reasonably necessary to enable Tenant to acquire the Liquor License for use in its restaurant and bar operations at the Premises. Tenant will prepare and file a complete application for approval of the transfer of the Liquor License with the Township of Livingston (the "Liquor License Transfer Approval") within twenty (20) days of

2377438-08

the date first written above and diligently pursue such approval and all other necessary governmental approvals, provided that the Liquor License Transfer Approval is to be obtained no earlier than the date on which Tenant has obtained the Construction Permit (as defined below) or waived its right to exercise the Construction Permit Contingency (as defined below). Tenant shall keep Landlord fully advised of the status of its application for Liquor License Transfer Approval throughout the approval process, including, without limitation, providing Landlord copies of all correspondence and documentation from and with the Township and any other applicable authorities concerning the same. Tenant represents and warrants to Landlord that at all times Tenant shall use the Liquor License and its rights thereunder in compliance with all applicable Laws, shall not commit any act or neglect to perform any act if such act or failure to act would result in the revocation of the Liquor License, and that in no event shall the Liquor License be (x) used at any location other than the Premises, (y) transferred by Tenant (without the prior written consent of Landlord and then only in connection with an assignment of Tenant's interest in this Lease), or (z) subject to any encumbrance, lien, security interests, or any other interest of any third party. In addition to the foregoing, at all times during the Term following the transfer of the Liquor License to Tenant, Tenant shall maintain a retail consumption liquor license for use in Tenant's operations at the Premises.

(c)    In the event that Tenant has not obtained the Liquor License Transfer Approval within one hundred and twenty (120) days of the date of the initial submission of an application for the same to the Township of Livingston (the " Liquor License Approval Period"), each of Landlord and Tenant shall have the right to terminate this Lease at any time following the expiration of the Liquor License Approval Period by giving written notice of such termination to the other party prior to the date on which the Liquor License Transfer Approval is granted. In the event of such termination of this Lease, Tenant shall withdraw its application for the Liquor License Transfer Approval.

2.5    **Escrow Agent.** Escrow Agent shall not be liable to any party for any act or omission, except for bad faith or gross negligence, and the parties hereby agree to indemnify and hold Escrow Agent harmless from any liability in connection with its role as Escrow Agent hereunder. The parties acknowledge that Escrow Agent is acting solely as a stakeholder for their mutual convenience. Tenant hereby acknowledges and waives any claims of conflict of interest with respect to Escrow Agent's dual role in connection with its representation of Landlord and service as the Escrow Agent. Escrow Agent shall not be required to defend any legal proceeding which may be instituted against it with respect to the Security Deposit, Liquor License Initial Payment, and/or the Note or the subject matter of this Lease, unless requested to do so by Landlord or Tenant and provided that Escrow Agent is indemnified to its satisfaction against all costs and expenses, including reasonable attorneys' fees, related to such defense.

## ARTICLE 3
## TERM

3.1    **Lease Term.** The term of this Lease will commence on the Commencement Date and, subject to the Option Period(s) (as defined below) continue until the

2377438-08

expiration of ten (10) full Lease Years from the Rent Commencement Date (the "Termination Date"). A "Lease Year" means a full twelve month year, plus for the first Lease Year any partial month in which the Rent Commencement Date falls if other than the first day of a calendar month. Reference to "Term", unless stated otherwise, includes the initial Term and any extension of the initial Term as set forth in Section 3.2 below.

      **3.2    Right of Extension.** Provided that there then exists no default by Tenant under this Lease nor any event that with the giving of applicable notice and and/or the passage of time would constitute a default, and that Tenant is the sole occupant of the Premises, and subject to the Landlord Termination Right (as defined below) Tenant shall have the right and option, exercisable by giving Landlord prior written notice thereof no less than six (6) months in advance of the Termination Date or the first or second extended Termination Date, as the case may be, to extend the Term of this Lease under the same terms and conditions (except for Base Rent, and this option to renew) as herein set forth for two (2) additional period(s) of five (5) years each (each, an "Option Period"), the first Option Period to begin on the date immediately succeeding the originally scheduled Termination Date, the second Option Period to begin on the date immediately succeeding the first extended Termination Date.

      **3.3    Landlord Termination Right.** Following receipt from Tenant of written notice of Tenant's election to extend the Term for an Option Period, Landlord shall have the right exercisable by giving Tenant a minimum of three (3) months prior written notice, to terminate this Lease (the "Landlord Termination Right") as of the last date of the then current Term (such date, the "Landlord Termination Date"). In the event that Landlord exercises the Landlord Termination Right, Landlord shall pay to Tenant, not later than the Landlord Termination Date, a termination fee in an amount equal to the sum of three (3) monthly installments of Base Rent at the rate payable for the month in which the Landlord Termination Date occurs and Tenant's election to extend the Term for such Option Period shall be null and void and of no force or effect. Tenant shall pay all Rent under the Lease and abide by all of the terms and conditions of the Lease through and including the Landlord Termination Date.

      **3.4    Construction Permit Contingency.** This Lease is contingent upon Tenant's obtaining a construction permit from the Township of Livingston for construction of initial alterations (the "Construction Permit"), which Tenant elects to have performed, if any, in preparation for Tenant's operations at the Premises in the event that any such alterations require a construction permit (the "Construction Permit Contingency"). In the event that Tenant has applied for but not obtained a construction permit within ninety (90) days of the date of the initial submission of an application for the same to the Township of Livingston (the "Construction Permit Approval Period"), which initial submission shall be made no later than thirty (30) days from the date first written above and which approval Tenant shall diligently pursue, each of Landlord and Tenant shall have the right to terminate this Lease at any time following the expiration of the Construction Permit Approval Period by giving written notice of such termination to the other party prior to the date on which the construction permit is issued. In the event of such termination of this Lease, Tenant shall withdraw its application for the Liquor License Transfer Approval.

2377438-08

**3.5   Margaritas Franchise Contingency.**   This Lease is contingent upon Tenant's obtaining final official documented acceptance as a franchisee of Tio Juan's Margaritas Mexican Restaurant and Tenant's entering into a Franchise Agreement with Tio Juan's Margaritas Mexican Restaurant (such documents, the "Franchise Documentation"). In the event that Tenant has not obtained and provided the Franchise Documentation to Landlord by October 31, 2010, this Lease shall be null and void. In the event of such termination of this Lease, Tenant shall withdraw its application for the Liquor License Transfer Approval and Escrow Agent shall return the Security Deposit, Liquor License Initial Payment, and Note to Tenant.

**ARTICLE 4**
**RENTALS AND PAYMENT OBLIGATIONS**
**SECURITY DEPOSIT**

**4.1   Base Rent.** (a) Tenant shall pay to Landlord at the address set forth in Section 1.1(b) above (or to such other address or by electronic funds transfer to such wiring instructions of which Landlord may notify Tenant from time to time), without previous demand therefore and without counterclaim, deduction or set-off, Base Rent, which shall be payable in equal monthly installments in advance on the first (1st) day of each month during the Term of the Lease, beginning on the Rent Commencement Date. In the event the Rent Commencement Date is other than the first (1st) day of the month in which it falls, then Tenant shall pay Base Rent and Additional Rent for the balance of that first (1st) month in which the adjusted Rent Commencement Date falls, on a pro rata basis through the end of that month.

(b) In consideration for Tenant accepting the Premises in its "as is" condition as provided in Section 2.1 above, Tenant shall be entitled to a credit to be applied against the payment of Base Rent in an amount equal to Thirty Thousand and 00/100 Dollars dollars ($30,000.00)(the "Base Rent Credit"). The Base Rent Credit shall be applied against monthly payments of Base Rent commencing on the date on which Tenant has completed all work necessary to bring the roof, parking lot and drive areas, and HVAC systems into good working order and condition and Tenant has provided Landlord written notice of the same (the "Work Completion Notice"). The Base Rent Credit shall be credited in equal installments over twelve (12) months commencing with the first payment of Base Rent due after the work described above is completed and the Work Completion Notice has been delivered to Landlord. The portion of the Base Rent Credit to be applied against each payment of Base Rent during such twelve (12) months shall be equal to Two Thousand Fight Hundred and 33/100 Dollars ($2,500.00). In no event shall Tenant be entitled to a cash payment from Landlord in lieu or replacement of all or any portion of the Base Rent Credit.

(c) During each Option Period, annual Base Rent shall be equal amount set forth in Section 1.1(i) for the applicable Option Period.

**4.2   Additional Rent.** The term "Additional Rent" shall include all amounts payable by Tenant to Landlord under this Lease, other than Base Rent. Any Additional Rent

sums to be paid by Tenant to Landlord shall be paid to Landlord within five (5) days of Tenant's receipt of Landlord's written tender and request for payment, except as may be provided to the contrary elsewhere in this Lease. Basic Rent and Additional Rent are collectively referred to in this Lease as "Rent." The Rent payable by the Tenant pursuant to this Lease is intended to be net to the Landlord, and all other charges and expenses imposed upon the Premises or incurred in connection with its use, occupancy, care, maintenance, operation and control shall be paid by the Tenant, excepting payments to be paid or obligations undertaken by the Landlord as specifically provided in this Lease.

4.3    **Payment.** Amounts to be paid by Tenant under this Lease will be paid as follows:

A.    **Base Rent and Additional Rent.** As provided above.

B.    **General Maintenance.** The costs of maintenance, operations, and repairs, will be paid by Tenant as they are incurred.

C.    **Taxes and Utilities.** Tenant will pay all real estate taxes, special assessments which may be levied on the Premises and utility costs incurred in connection with the operation of the Premises on and after the Commencement Date as more specifically set forth below at Article 9.

4.3A    **Real Estate Tax Appeal.** As of the date of this Lease, there is a pending tax appeal that might affect the assessed valuation, tax rate or taxes due on the Property. Landlord agrees to use reasonable efforts to continue to pursue such appeal, provided that in no event shall Landlord be obligated to appeal any decision or ruling with respect thereto. Any adjustments to real estate taxes and/or assessments due to the pending tax appeal ("Tax Appeal Adjustment") shall be apportioned between Landlord and Tenant as follows: (i) for periods up to the Commencement Date, Landlord shall be entitled to any amounts refunded or credited as a result of any decrease in the amounts owed for periods prior to the Commencement Date, and (ii) for periods from and after the Commencement Date and through the Termination Date, any changes in taxes shall be to the benefit of Tenant to the extent Tenant is paying Taxes as required hereunder. As to any credit received by or benefiting Tenant against taxes which would otherwise be due to which Landlord is entitled to the benefit of as provided above, Tenant shall pay to Landlord an amount equal to such credit within ten (10) days of the date on which the taxes against which such credit has been applied would otherwise be due.

4.4    **Late Charges.** If Tenant shall fail to pay when due and payable any amount or charge accruing under this Lease to Landlord, including all Rent and any sums expended by Landlord to cure a default by Tenant hereunder, and such non-payment shall continue for 5 days thereafter, such unpaid amounts shall bear interest at the Lease Interest Rate from the date Tenant's payments are first due to the date of payment; provided, however, that the payment of such interest shall not excuse or cure any default upon which such interest may have accrued. Nothing contained herein shall be deemed to suspend or delay the payment of any

amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of Landlord.

      **4.5**    **Security Deposit.** (a) Tenant shall deposit the Security Deposit with Escrow Agent upon the execution of this Lease. Upon Landlords and Escrow Agents receipt of the Franchise Acceptance Documentation, Escrow Agent shall release the Security Deposit from escrow to Landlord. The Security Deposit shall be security for the faithful performance and observance by Tenant of the terms, covenants and conditions of this Lease, including the surrender of possession of the Premises to Landlord as herein provided.

      (b)    Upon the occurrence of an Event of Default (as defined below), Landlord may use, apply or retain the whole or any part of the cash Security Deposit , as the case may be, to the extent required for the payment of any Rent or any other sum as to which Tenant is in default, including (i) any sum which Landlord may expend or may be required to expend by reason of Tenant's default, and (ii) any damages to which Landlord is entitled pursuant to this Lease or applicable law, whether such damages accrue before or after summary proceedings or other reentry by Landlord. If Landlord uses, applies or retains any part of the Security Deposit, Tenant, upon demand, shall deposit with Landlord the amount so applied or retained so that Landlord shall have the full Security Deposit on hand at all times during the Term. If Tenant shall fully and faithfully comply with all of the terms, covenants and conditions of this Lease, the Security Deposit (or so much thereof as remains) shall be returned to Tenant after the Termination Date and after delivery of possession of the Premises to Landlord in the manner required by this Lease. Tenant expressly agrees that Tenant shall have no right to apply any portion of the Security Deposit against any of Tenant's obligations to pay Rent hereunder.

      (c)    In the event of a sale of the Premises by Landlord, Landlord shall have the right to transfer the cash Security Deposit to the vendee, and Landlord shall be considered released by Tenant from all liability for the return of such security and all obligations of Landlord with respect to the Security Deposit, and the Security Deposit, shall, by the mere act of such transfer or assignment by Landlord, be deemed assumed by such assignee of Landlord. In the event of such sale, Tenant agrees to look solely to the new Landlord for the return or cancellation of said security, and it is agreed that this shall apply to every transfer or assignment made of the security to a new Landlord. Tenant will not assign or encumber, or attempt to assign or encumber, the cash Security Deposit, and neither Landlord nor its successors or assigns shall be bound by any such actual or attempted assignment or encumbrance.

      (d)    In the event of the insolvency of Tenant, or in the event of the entry of a judgment in bankruptcy in any court against Tenant which is not discharged within thirty (30) days after entry, or in the event a petition is filed by or against Tenant under any chapter of the bankruptcy laws of the State of New Jersey or in the United States of America, then in such event, Landlord may require the Tenant to increase the amount of the Security Deposit to adequately assure Tenant's performance of all of its obligations under this Lease, including all payments subsequently accruing. Failure of Tenant to do so within five (5) days after Landlord's written demand shall constitute an Event of Default by Tenant.

2377438-08

## ARTICLE 5
## USE AND OCCUPANCY

**5.1    Purpose.** The Premises, or any part thereof, shall not be used by anyone except the Tenant, its customers, and employees, and shall be used for no purpose other than as specified in Section 2.2 above.  Tenant shall not use or permit the use of all or any part of the Premises so as to subject the Premises to the provisions of the Environmental Clean-Up Responsibility Act or the Industrial Site Recovery Act (N.J.S.A. 13:1K-6) ("ISRA").

**5.2    Conformance to Law.** In conducting its business on the Premises, Tenant covenants to conform to all applicable governmental regulations and licensing requirements and will not use, suffer or permit the use of the Premises for any business or purpose that is in violation of any law or the rules or regulations of any public authority. Tenant shall promptly comply with all present and future laws, regulations or rules of any local, county, state, federal and other governmental authority and any bureau or department thereof (collectively, "Laws"), and of the National Board of Fire Underwriters, or any other body exercising similar functions, which may be applicable to the Premises, including the making of any changes, alterations or additions in the fire detection and prevention system or equipment .

**5.3    Character of Operation.** Tenant shall not permit the Premises, or any part thereof, to be used for any immoral purpose or in any manner that causes a public nuisance or that may injure the Premises or the reputation, character or appearance of the Premises, nor objectionable noise or odor or the use of any advertising medium such as loudspeakers, sound amplifiers or phonographs in a manner to be heard outside of the building or off the Premises. No auction, fire, going out of business, liquidation, distress or bankruptcy sales or any other similar practices may be conducted in the Premises without the previous written consent of Landlord.

**5.4    Plumbing Facilities; Grease Traps; Floor Loads; Roof.** The plumbing facilities of the Premises shall not be used for any purpose other than that for which they were constructed, nor shall any substances be disposed of in such facilities that may clog, erode or damage the plumbing, pipes, lines or conduits connected to the Premises. If required by the governing authorities or necessary to accommodate Tenant's operations, Tenant shall install grease traps necessary to prevent the accumulation of waste in the plumbing facilities servicing the Premises. Tenant shall not place a load on any floor exceeding the floor load per square foot that such floor was designed to carry. Tenant shall not install, operate or maintain any heavy item of equipment in the Premises, except in such manner as to achieve a proper distribution of weight. Tenant shall not use the roof of the Premises for any purpose other than that approved by Landlord. Tenant shall be responsible for the expense of any breakage, stoppage or damage resulting from a violation of these provisions where it is caused by Tenant and/or Tenant's employees, agents, representatives, subtenants, contractors, licensees, customers, and/or invitees (individually and collectively, "Tenant Parties").

2377438-08

**5.5    Waste.** Tenant shall not commit, permit, or suffer to be committed any waste upon the Premises or use the Premises for any extra-hazardous purpose or in any manner that will violate, suspend, void or serve to increase the premium rate of or make inoperative any policy or policies of insurance of any kind whatsoever at any time carried on the Premises or any part thereof.

**5.6    Tenant's Trade Name.** Tenant will operate under the Tenant's Trade Name.

**5.7    Hazardous Substances.** Tenant shall not (a) use, store, generate, treat, sell or dispose in, on, from or about the Premises any "Hazardous Substances" (hereinafter defined), or (b) permit the use, storage, generation, treatment, selling or disposal, in, on, from or about the Premises of any Hazardous Substances; except Hazardous Substances in such amounts and of such types that are commonly and customarily used in the cleaning, maintenance and operation of restaurants and in a manner that complies with all (i) laws, rules, regulations, ordinances, codes and any other governmental restriction or requirement of all federal, state and local government authorities having jurisdiction thereof regulating such Hazardous Substances or any other environmental law or regulation, including ISRA, the Environmental Clean-up Responsibility Act, the Resource Conservation and Recovery Act (42 U.S.C. sec. 6901 et seq.), the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. sec. 9601 et seq.) (collectively, "Governmental Regulations"), (ii) permits issued for any Hazardous Substances (which permits Tenant shall obtain prior to bringing any Hazardous Substances in, on or about the Premises), and (iii) applicable producers' and manufacturers instructions and recommendations. "Hazardous Substances" or "Hazardous Substance" as used in this Lease shall mean any substances or substance now or hereafter designated as, or containing components designated as, hazardous, dangerous, toxic or harmful and/or subject to Governmental Regulations, including, without limitation, asbestos in any form, urea formaldehyde foam insulation, transformers or other equipment which contains electric fluid or other fluids containing levels of polychlorinated biphenyls and petroleum products in any form. Tenant shall (x) promptly, timely, and completely comply with all Governmental Regulations now or hereafter pertaining to the use, discharge, handling, transportation, disposal, treatment, generation, storage, sale or presence on the Premises of Hazardous Substances, and (y) allow Landlord or Landlord's agents or representatives to enter onto the Premises at all times to check Tenant's compliance with all applicable Governmental Regulations regarding Hazardous Substances.

**5.8    Existing Furniture, Fixtures and Equipment of Landlord.** It is agreed that on the date of this Lease, Landlord owns the furniture, fixtures and equipment located on the Premises. After delivery of possession of the Premises to Tenant by Landlord, Landlord shall transfer title of the furniture and non-affixed equipment located on the Premises to Tenant, provided that, without limitation, title to HVAC equipment, refrigerators, and exhaust hoods shall not be transferred but Tenant may use the same during the Term of the Lease pursuant to the terms hereof), or, subject to Landlord's prior written consent, Tenant may dispose of remaining furniture, fixtures and equipment on the Premises in a manner that will facilitate

2377438-08

Tenant's use of the Premises.

## ARTICLE 6
## ASSIGNMENT AND SUBLETTING

**6.1    Tenant Assignment.** Tenant shall not voluntarily, involuntarily or by operation of law, assign or transfer this Lease, in whole or in part, or any interest therein, nor sublet all or any part of the Premises or permit any other persons (including licensees and concessionaires) to occupy the same (any such occurrence, an "Assignment") without the prior written consent of Landlord in each instance, any references elsewhere herein to assignees, subtenant or other persons notwithstanding; provided that Landlord's consent to an Assignment shall not be unreasonably withheld in the event that the person or entity to which such Assignment is proposed has a net worth equal to $1 million or more and the other requirements of this Article 6 regarding the Assignment are satisfied. Any attempted transfer, assignment or subletting without Landlords prior written consent shall be void and shall confer no rights upon any third person, and shall at the sole option of Landlord constitute an Event of Default by Tenant under this Lease. The consent of Landlord, if given in one instance, shall not constitute a waiver of the necessity for such consent in any other instance. As a condition to any assignment of this Lease by Tenant that is permitted hereunder, the assignee thereof shall be required to execute and deliver to Landlord an agreement, in recordable form, whereby such assignee assumes and agrees with Landlord to discharge all obligations of Tenant under this Lease. A transfer or sale, whether directly or indirectly, of the interest of Robert Kurtz in the Tenant, or of fifty percent (50%) or more of the voting shares, membership or partnership interests or other ownership or controlling interests in Tenant by any holder of such interest in Tenant shall be deemed an assignment of this Lease by Tenant requiring Landlord's prior written consent.

**6.2    Receipt of Rent.** If this Lease be assigned, or if the Premises or any part thereof be sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained.

**6.3    Landlord Consent.** If Landlord consents to any transfer or assignment of this Lease or subletting of the Premises, such consent shall not be effective unless and until Tenant gives notice of the assignment or subletting and a copy of the assignment or sublease to Landlord, and the transferee, assignee or sublessee delivers to Landlord a written agreement in form and substance satisfactory to Landlord pursuant to which such transferee, assignee or sublessee assumes all of the obligations and liabilities of Tenant under this Lease.

**6.4    Landlord's Costs.** Tenant agrees to pay Landlord upon demand all reasonable administrative, attorneys and other professionals fees, and other costs and expenses incurred by Landlord in connection with the processing or documentation of any assignment,

2377438-08

transfer or subletting pursuant to this Article, up to a maximum amount for each such assignment, transfer or subletting of Two Thousand Dollars ($2,000.00). Each request to Landlord for consent to any transfer or assignment of this Lease or subletting of the Premises shall be accompanied by a nonrefundable fee payable to Landlord in the amount of One Thousand Dollars ($1,000.00) which shall be applied toward Landlord's costs and expenses (i.e. $2,000.00) described above.

**6.5    Submissions to Landlord.** If Tenant shall request Landlord's consent to any assignment of this Lease or to any subletting of all or any part of the Premises, Tenant shall submit to Landlord with such request the name and address of the proposed assignee or subtenant, the nature of the proposed business it will operate at the Premises, the terms of the proposed sublease or assignment, and reasonable financial information so that Landlord can evaluate the proposed subtenant or assignee, the effective date of the proposed assignment or subletting, and such additional or other information as Landlord may reasonably require. Landlord shall be under no obligation to consent to any assignment or subletting by Tenant.

**6.6    Landlord Assignment/Release.** Landlord's rights to assign this Lease are and shall remain unqualified. Upon any sale or transfer of Landlord's interest in this Lease, Landlord shall thereupon be released from all obligations of the Landlord hereunder and shall not be subject to any liability resulting from any act, omission or event occurring after such conveyance. Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Premises, or upon the sale or other transfer of Landlord's interest in this Lease, attorn to the transferee upon any such foreclosure, sale or transfer and recognize such transferee as the Landlord under this Lease. Tenant further agrees upon request to execute and deliver a recordable instrument setting forth the provisions of this Article.

**6.7    Subordination.** This Lease and the interest of Tenant in the Premises created by this Lease shall be subject and subordinate to any deed of trust or mortgage lien or charge (collectively,  herein referred to as a "Mortgage") and to any ground lease, easement agreement or operating agreement (collectively, herein referred to as an "Agreement") which is or at any time hereafter may be placed upon the Premises by Landlord, and any replacement, renewal, modification, refinancing, supplement or extension of any such Mortgage or Agreement. Any such Mortgage shall, for the full amount of principal at any time advanced thereon or secured thereby, with interest, be prior and paramount to this Lease and to the rights of Tenant hereunder and all persons claiming through or under Tenant, or otherwise, in the Premises. Tenant, on Tenant's behalf, and on behalf of all persons claiming through and under Tenant, covenants and agrees that Tenant will, from time to time at the request of Landlord or the holder of any Mortgage, execute and deliver any necessary or proper instruments or certificates acknowledging the priority of the lien or charge of such Mortgage and/or Agreement to this Lease and the subordination of this Lease thereto. Notwithstanding anything to the contrary in this paragraph, in the event the holder of any such Mortgage elects to have this Lease superior to its Mortgage, then upon Tenant being notified to that effect by such encumbrance holder, this Lease shall be deemed prior to the lien of said Mortgage (but not in respect to the

2377438-08

priority of entitlement to insurance proceeds or any award in condemnation), whether this Lease is dated prior or subsequent to the date of such Mortgage, and Tenant shall execute, acknowledge and deliver an instrument in the form used by such encumbrance holder effecting such priority. Upon Tenant's request, Landlord shall secure for Tenant a non-disturbance agreement (recognizing Tenant's rights under this Lease) from the holder of any future (but not existing) Mortgage or Agreement on such holder's standard form, provided that Tenant shall also execute and deliver to Landlord such form of non-disturbance agreement.

6.8    **Tenant Not Released.** Notwithstanding any assignment, sublease or other transfer pursuant to this Article, Tenant shall remain fully liable on this Lease and shall not be released from performing any of the terms, covenants, conditions and obligations of this Lease.

## ARTICLE 7
## MAINTENANCE, REPAIRS AND ALTERATIONS

7.1    **By Tenant.** Tenant agrees, at its own cost and expense, to maintain and keep in good repair the Premises, including the roof, foundation, structure, interior walls, and exterior walls of the Premises. All maintenance and repair work undertaken by Tenant will be done in a good and workmanlike manner, leaving the Premises free of liens for labor or materials.

7.2    **Alterations.** Tenant shall not make or cause to be made any alterations, additions or improvements of any kind or nature to the Premises or install or cause to be installed any trade fixtures, exterior signs, floor coverings, interior or exterior lighting, plumbing fixtures, shades or awning or make any changes to the Premises frontage without first obtaining Landlord's written approval and consent, which shall not be unreasonably withheld, conditioned or delayed. Tenant shall present to Landlord plans and specifications for such work at the time approval is sought in a form satisfactory to Landlord. If Landlord has not responded to Tenant within ten (10) business days of Landlord's receipt of notice from Tenant requesting such consent (together with the plans and specifications referenced above), Tenant's request shall be deemed approved and the applicable work may be completed subject to the applicable provisions of this Lease. Tenant is authorized at its own expense to make such alterations, repairs, and additions within the interior of the building on the Premises as it finds necessary for its purposes and as may be permitted by laws and regulations in force at the time, as long as such alterations, repairs and additions do not affect or involve the structural components of the building, the buildings appearance, value, HVAC systems, plumbing or electrical systems, or penetrations of the roof, structurally weaken the building or render the same unsafe; provided, Tenant must obtain Landlords prior written consent for any alteration(s) exceeding $50,000. The term "improvements" shall include those additions, alterations, and improvements made by Tenant to the building on the Premises which are made pursuant to this Lease, including without limitation the furnishing of the interior of the building on the Premises or the installation of fixtures. Upon completion, Tenant shall provide as-built plans and other documentation requested by Landlord in connection with any alterations, additions or improvements made by Tenant. Landlord's consent on one occasion to any alterations, additions or improvements shall not be deemed

consent for any subsequent alterations, additions or improvements. Landlord's review of all requests for consent or approval under this Article and plans, materials, inspections, and applications related thereto shall be at Tenant's sole cost and expense, up to a maximum amount for each such request for consent of Two Thousand Dollars ($2,000.00).

7.3    **Liens.** Tenant shall not permit to be created or to remain undischarged any lien, encumbrance or charge arising out of any work of any contractor, mechanic, laborer or material man that might be or become a lien, encumbrance or charge upon the Premises or the income therefrom, and Tenant shall not suffer any other matter or thing whereby the estate, right and interest of Landlord in the Premises might be impaired. If any lien or notice of lien on account of an alleged debt of Tenant or Tenant's agents or any notice of contract by a party engaged by Tenant or Tenant's agents to work in the Premises shall be filed against the Premises, Tenant shall promptly give Landlord notice of such lien and shall cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise obtain security as may be necessary in Landlord's judgment to prevent foreclosure proceedings against the Premises and to permit a reputable title insurance company to insure over the lien during the pendency of such contest. If Tenant shall fail to cause such lien or notice of lien to be discharged or failure to furnish such security within the period provided, then Landlord in addition to any other rights or remedies may but shall not be obligated to discharge the same by either paying the amounts claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings without inquiring into the validity thereof; and in any such event, Landlord shall be entitled, if Landlord so elects, to defend any prosecution of any action for foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs or allowance. Any amount paid by Landlord and all costs and expense, including attorney's fees, incurred by Landlord in connection therewith, together with interest thereon at the Lease Interest Rate specified herein from the respective dates of Landlord's making of the payment or incurring of the cost and expense shall be paid by Tenant to Landlord on demand, or alternatively be classified as rent by Landlord and collectible as such with the next regular rental payment. Failure to make such additional rent payment shall constitute a default under this Lease by Tenant at the option of Landlord.

7.4    **Property of Landlord.** All alterations, improvements and additions to the Premises, including but not limited to light fixtures and heating and air conditioning equipment, shall be made in a good and workmanlike manner and in accordance with all applicable laws and insurance requirements. Immediately when made or installed, alterations, improvements and additions shall be deemed to have attached to the freehold and to have become the property of Landlord and shall remain for the benefit of Landlord at the end of the term, or other expiration of this Lease, in as good order and condition as they were when installed, reasonable wear and tear excepted; provided, however, that if Landlord by written notice requires that Tenant remove any alteration, improvement, addition or utility installation at the end of the Term, then Tenant, at its sole cost and expense, shall remove the same and repair any damage caused thereby before the end of the Term. Moveable trade fixtures, artifacts and furniture installed by Tenant shall remain the property of Tenant. In the event of making such alterations, improvements and/or additions as herein provided, Tenant shall indemnify and save Landlord harmless from all

2377438-08

expense, liens, claims or damages to either persons or property arising out of or resulting from undertaking or making of said alterations, additions and improvements.

       **7.5    Insurance.** Tenant shall not make any alterations, repairs or installations, or perform any other work to the Premises unless, prior to the commencement of such work, Tenant shall obtain (and during the performance of the work keep in force) comprehensive general liability and worker's compensation insurance to cover every contractor and subcontractor to be employed, and Tenant's contractors shall carry builder's risk insurance in an amount then customarily carried by prudent contractors but in any event in an amount no less than the final cost of the alterations, repairs, and/or installations. The policies shall be non-cancelable without thirty (30) days notice to Landlord and shall be carried with companies and in a form reasonably satisfactory to Landlord. Prior to the commencement of the work, Tenant shall deliver duplicate originals or certificates of such insurance policies to Landlord. If the estimated cost of any alterations, additions or improvements exceeds Fifty Thousand ($50,000.00) Dollars, Tenant shall supply a lien and completion bond, labor and materials payment and performance bonds, or bank letter of credit in form acceptable to Landlord, or other security satisfactory to Landlord, in an amount equal to the estimated cost to insure Landlord against materials and mechanics' liens and for completion of the alterations, additions or improvements, in favor of and in amounts satisfactory to Landlord, written by a surety company or bank acceptable to Landlord guaranteeing the completion of Tenant's work and payment of all Contractors, Sub-Contractors, Material men, Suppliers and the like.

       **7.6    Signs.**

       (a)    Tenant shall have the right, at Tenant's sole cost and expense, to install and maintain identification signage with Tenant's name on or visible from the exterior of the Premises (the "Exterior Signage"), subject to the following terms and conditions: (i) the size, location and illumination of Exterior Signage shall be approved in writing by Landlord, such approval not to be unreasonably withheld, conditioned or delayed; (ii) prior to the installation of Exterior Signage, Tenant shall deliver to Landlord complete plans for the installation of such Exterior Signage for Landlord's review and approval, such approval not to be unreasonably withheld, conditioned or delayed; (iii) prior to the installation of Exterior Signage, Tenant shall obtain all required municipal and other governmental approvals therefor and shall submit copies of the same to Landlord; and (iv) Tenant shall repair all damage to the Premises and building caused by the installation of Exterior Signage.

       (b)    Tenant shall at its own expense maintain and keep in good repair all Exterior Signage, shall save Landlord harmless from any loss, cost or damage as a result of the erection, maintenance, existence or removal of the same. Upon vacating the Premises, Tenant shall remove all signs and repair all damages caused by such removal.

       **7.7    General Maintenance.** Tenant shall at its sole cost and expense keep and maintain the Premises in a careful, safe, clean and proper manner and shall maintain in good order and condition, and make replacements and repairs to the Premises and every part thereof,

including without limiting the generality of the foregoing, the roof, interior and exterior masonry, steps, stairways, all plumbing, sewerage (including the flow to the main sewer line), all air conditioning and heating facilities (including exterior mechanical equipment), the sprinkler system within the Premises, fixtures, leasehold improvements, interior walls, floors, ceilings, sides, storefronts, security gates, windows, doors, door closures and other door appliances and appurtenances, glass, showcases, skylights, all electrical facilities, utilities, meters and equipment, including lighting fixtures, lamps, fans, and electric motors, all other appliances and equipment of every kind and nature, all landscaping upon or attached to the Premises, and all vestibules, entrances and returns located within the Premises, and all alterations, additions and improvements to any of the foregoing made by Tenant. In addition, Tenant shall maintain and keep clean any loading platform, truck dock and/or maneuvering space therefore which is used by Tenant. Tenant shall at its sole cost and expense clean and maintain sidewalks, parking areas and driveways (including repaving, patching, restriping and sealing) and keep the same free from snow and ice; maintain landscaping; maintain the basement and any patio areas, if any, on the Premises; and provide janitorial services. Tenant shall be solely responsible for the cost of any work performed while preparing the Premises for occupancy.

      **7.8 Air Conditioning/HVAC.** Tenant shall employ a firm engaged in the business of maintaining HVAC systems to maintain the HVAC system serving the Premises, to inspect such system at least once every year, and to report in writing to Landlord and Tenant the results of each such inspection and the repairs and/or replacements recommended by such firm. Any such firm employed by Tenant shall be fully licensed and experienced in maintaining HVAC systems similar to those located at the Premises. Tenant shall promptly make the repairs and/or replacements so recommended. Without limiting Tenant's obligations set forth elsewhere in this Lease, in the event Tenant, with Landlord's approval, installs, uses, keeps or maintains air conditioning or other equipment on the roof of the building of which the Premises form a part, Tenant agrees to specifically assume primary responsibility for the maintenance and repair of that portion of the roof where such installation is made and such installation and the operation, maintenance and repair thereof shall be made in such manner that the rights of Landlord under any roofing bond or roof guaranty then in force shall not be affected or voided thereby.

      **7.9 Approvals.** Tenant shall, before making any alterations, additions, installations, or improvements, at its sole cost and expense, obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies and (upon completion) certificates of final approval thereof ("Approvals") and shall deliver promptly duplicates of all such permits, approvals and certificates to Landlord. Prior to any application or submission by Tenant to any governmental or quasi-governmental bodies seeking an Approval, all materials to be provided in connection therewith to the applicable governmental body shall be submitted to Landlord for its approval, not to be unreasonably withheld.

      **7.10 Landlord Cure.** If Tenant fails to perform its obligations under this Article, Landlord may, at Landlord's option, enter upon the Premises either during or at the end of the Term and put the same in good order, condition and repair; and the cost thereof shall become due and payable as additional rent by Tenant to Landlord upon demand, but nothing

contained in this sentence shall be deemed to impose any duty upon Landlord or affect in any manner the obligations placed upon Tenant by this Article.

**7.11    Termination.** Upon the termination of this Lease, Tenant shall surrender to Landlord, without notice, the Premises and all keys thereto including, without limitation, the buildings, apparatus and fixtures, except moveable trade fixtures, artifacts and furniture installed by Tenant at Tenant's expense, then upon the Premises, in a good condition and repair as the same shall be at the commencement of the Term of this Lease, reasonable wear and tear excepted. Tenant shall remove all property of Tenant permitted to be removed hereunder and repair all damage to the Premises caused by such removal and restore the Premises to the condition they were prior to the installation of articles so removed. In the event Tenant fails to effect such removal or make the necessary repairs or restoration, Landlord may do so, and Tenant hereby agrees to reimburse Landlord for all costs and expenses incurred therewith. All property not so removed shall be the property of Landlord, and upon the termination of this Lease, shall be surrendered to Landlord by Tenant without injury, damage or disturbance thereto or payment therefore. Such property shall include without limitation all components of the heating, air conditioning (including the portion, if any, outside the Premises) plumbing and electrical systems, lighting fixtures, all escalators, elevators, dumbwaiters, conveyors and all partitions (whether removable or otherwise). Tenant agrees to cooperate with Landlord with respect to assigning or otherwise providing Landlord the benefit of all warranties and guarantees pertaining to the Premises and all improvements, alterations, repairs, maintenance, installed or performed, and equipment erected or installed, upon the Premises.

## ARTICLE 8
## INDEMNITY, INSURANCE, CASUALTY AND CONDEMNATION

**8.1    Tenant Indemnity.** Tenant shall indemnify, defend and save harmless the Landlord from, and shall reimburse the Landlord as Additional Rent, for all expenses, damages, or fines incurred or suffered by the Landlord by reason of any Landlord claims or third party claims arising as a result of any breach, violation, or non-performance by the Tenant or any Tenant Parties of any covenant or provision of this Lease, or by reason of damage or injury to persons or property caused by the Tenant or Tenant Parties on or about the Premises, or by the installation or removal of furniture, fixtures, vehicles or other property of the Tenant or Tenant Parties, or arising out of the occupancy or any use by the Tenant or Tenant Parties of the Premises, or from any other cause due to the negligence, improper conduct, or intentional acts or omissions of the Tenant or Tenant Parties. Tenant shall not be responsible to indemnify Landlord for any losses arising solely from Landlord's gross negligence or intentional misconduct.

**8.2    Insurance.**

(a)    Tenant shall obtain and keep in force (i) worker's compensation insurance in statutory amounts, (ii) employer's liability insurance with a $500,000 minimum limit covering all of Tenant's employees, and (iii) comprehensive general liability insurance against claims for

2377438-08

bodily injury, death or property damage occurring on, in or about the Premises, and on, in or about the adjoining streets, property and passageways arising out of the operation and control of the Premises including, but not limited to contractual liability in connection with Tenant's indemnification obligations hereunder, and in connection with any liability of Landlord to Tenant's employees or other persons, in a total single limit of not less than One Million Dollars ($1,000,000) in respect to any one occurrence, accident or disaster, including without limitation, up to the full limit of the policy ($2,000,000 in the aggregate), in respect to bodily injury or death to any one person and property damage with a deductible of no greater than Ten Thousand ($10,000) Dollars or such other amounts as may from time to time be reasonably required by Landlord, or the holder of any mortgage encumbering the Property (provided that if the holder of any mortgage requires insurance in excess of the amounts required by this Lease and Landlord directs Tenant to obtain the same, Landlord shall pay the additional premium amount for obtaining such excess coverage amounts).  In addition, if alcoholic beverages are sold in or on any portion of the Premises, Tenant shall maintain innkeepers liability coverages (or such similar special coverages as shall customarily be maintained by owners or operators of facilities of equivalent class in the State of New Jersey)(any such coverage, "Liquor Liability Coverage"), and so long as any alcoholic beverages shall be served, sold, or otherwise made available upon or from the Premises, Tenant shall maintain Liquor Liability Coverage, in such form and with such limits of coverage as are then generally being maintained by operators of facilities of equivalent class in the State of New Jersey, but in any event no less than One Million Dollars ($1,000,000) in respect to any one occurrence, with a deductible of no greater than Ten Thousand ($10,000) Dollars or such other amounts as may from time to time be reasonably required by Landlord, or the holder of any mortgage encumbering the Premises (provided that if the holder of any mortgage requires insurance in excess of the amounts required by this Lease and Landlord directs Tenant to obtain the same, Landlord shall pay the additional premium amount for obtaining such excess coverage amounts). Tenant shall also obtain and keep in force Umbrella Liability insurance with limits of liability of not less than $5,000,000 per occurrence, $8,000,000 in the aggregate, that is in excess of the insurance coverages required herein, including without limitation, Liquor Liability Coverage, with the Umbrella Liability Insurance policy listing all such underlying required insurance coverages on its schedule of underlying Insurance. Tenant shall cause Landlord to be named as an additional insured on said liability insurance policies.

(b)    Tenant agrees that at all times during the Term of this Lease it will keep the Premises continuously insured against loss or damage by fire and all other risks covered by the standard 'all-risk' fire and extended coverage endorsements from time to time available in amounts not less than the full insurance replacement value thereof (with replacement cost coverage), but in no event shall the amount of such insurance coverage be less than Two Million Dollars ($2,000,000).  A minimum $1.5 million for Demolition coverage, $1.5 million for Increased cost of construction, Ordinance or Law coverage minimum of 50% coverage "A", and "Systems Breakdown/Equipment Breakdown coverage", shall also be maintained by Tenant at all times during the Term of this Lease.

(c)    Tenant agrees that at all times during the Term of this Lease shall obtain and keep in force business interruption insurance in such amounts as will reimburse Tenant for direct or

indirect loss of earnings attributable to all perils commonly insured against by prudent tenants or assumed by Tenant pursuant to this Lease or attributable to prevention or denial of access to the Premises, or building on the Premises as a result of such perils, which amounts shall at a minimum provide sufficient coverage to Tenant to cover all Base Rent and Additional Rent payable under this Lease and amounts payable under the Note.

(d)     All liability insurance required to be provided by Tenant by the provisions of this Lease shall be carried in favor of Landlord, Tenant and any lender holding a mortgage encumbering the Premises (a "Mortgagee"), as their respective interests may appear.     All insurance shall provide coverage on an "occurrence" basis.

(e)     All policies referred to hereunder, and required to be procured by Tenant, shall be paid for by Tenant.  If Tenant fails to procure the insurance as required hereunder, Landlord reserves the unqualified right at any time to secure any insurance that is required of Tenant at Tenant's expense.  On Landlord's written demand, reimbursement shall be made as Additional Rent.

(f)     Tenant shall procure policies for all said insurance for periods of not less than one (1) year commencing on or prior to the Commencement Date and shall deliver to Landlord prior to the Commencement Date a certificate, acceptable to Landlord, of such policies and of the payment of premiums thereon and shall procure renewals thereof from time to time, delivering certificates (in form acceptable to Landlord) of said renewals to the Landlord at least thirty (30) days before the expiration thereof, together with evidence of payment, and In any event, a new certificate or certificates as described above acceptable to Landlord shall be provided by Tenant to Landlord at least once per year.  All such certificates shall require thirty (30) days' prior notice by the insurer to Landlord and to any Mortgagee of any cancellation thereof or change therein affecting the coverage thereunder and name Landlord and Mortgagee as insured or additional insureds.

(g)     Notwithstanding anything to the contrary in this Lease, Landlord and Tenant mutually waive their respective rights of recovery against each other and each other's officers, directors, constituent partners, agents and employees, and Tenant waives such rights against each Mortgagee to the extent any loss is or would be covered by fire, extended coverage, and other property insurance policies required to be carried under this Lease or otherwise carried by the waiving party, and the rights of the insurance carriers of such policy or policies to be subrogated to the rights of the insured under the applicable policy, even though such loss or damage may have been occasioned by the negligence of Tenant or Landlord, their agents, employees, independent contractors, customers, licensees or invitees.  Each party shall cause its insurance policy to be endorsed to evidence compliance with such waiver.

(h)     Tenant will not do or suffer to be done, or keep or suffer to be kept, anything in, upon or about the Premises which will contravene Landlord's policies, if any, insuring against loss or damage by fire or other hazards (including, without limitation, public liability) or which will prevent Landlord from procuring such policies in companies acceptable to Landlord.  If

2377438-08

Tenant's operations or activities in, upon or about the Premises, or anything done, omitted to be done or suffered by Tenant to be kept in, upon or about the Premises, shall cause the rate of fire or other insurance on the Premises to be increased beyond the rate from time to time applicable thereto for the customary use or uses thereof, upon Landlord's demand, Tenant will pay, as Additional Rent, the amount of any such increase.

(i)    Insurance policies required hereunder shall be maintained with companies having a Best's rating of not less than B+/VIII and are licensed to do business in the State in which the Premises is located. Tenant shall not do or permit to be done anything which shall invalidate the insurance polices referred to in this Article. Each such policy shall provide that (i) no act or omission of Tenant, other than Tenant's intentional acts, shall affect or limit the obligation of the insurance company to pay the amount of any loss sustained, and (ii) all rights of subrogation as to claims of property damage only shall be waived as against the Landlord or Tenant, respectively.

**8.5 Damage or Destruction by Casualty.** Damage to, or destruction of, any portion or portions of the Premises by reason of fire, the elements, unavoidable accident, or any other peril or other casualty (collectively, "Casualty") will not terminate this Lease or entitle the Tenant to surrender or vacate the Premises or otherwise affect the respective obligations of Landlord and Tenant, except as specifically provided below. If such damage or destruction occurs, Tenant and Landlord will proceed with due diligence to collect and hold in trust the proceeds of all available insurance covering the same, and will thereafter repair and restore the Premises to the same conditions as existed prior to the Casualty in the manner provided below. Landlord and Tenant shall cooperate in settling claims against the carrier of the insurance on the Premises, and the proceeds of such policies shall be paid jointly to Tenant and Landlord as their interests may appear or as they shall determine. Tenant acknowledges that neither Base Rent, Additional Rent, or any payment under the Note shall be abated in the event of a Casualty, Tenant having agreed to address the risks associated with the limitation and/or loss of use of the Premises due to a Casualty or otherwise through business interruption insurance.

**8.6    Substantial or Total Destruction.** If the Premises shall be damaged by Casualty to the extent of fifty percent (50%) or more of the cost of replacement thereof or to the extent of less than fifty percent (50%) of the cost of replacement thereof during the last two (2) years of the then current Term of this Lease (whether the initial Term, or if previously exercised by Tenant, an Option Period), then Tenant shall have the option to either (a) terminate this Lease, or (b) rebuild the Premises utilizing the insurance proceeds. Said option shall be exercised by notice to Landlord and be given not more than two (2) months from the date of such damage. If Tenant terminates the Lease, the insurance proceeds will be delivered to Landlord, less the amount of such proceeds covering Tenant's furniture and equipment. If Tenant elects to rebuild the Premises, Tenant shall upon receipt of the insurance proceeds from Tenant and Landlord, repair and restore the Premises (including Tenant's trade fixtures, decorations, signs, floor covering, wall covering, carpeting, plate glass, furniture, equipment, personal property, merchandise, inventory and contents) at least to the condition existing immediately prior to the Casualty. In reconstructing the Premises after a Casualty, Tenant shall obtain Landlord's

approval prior to such construction and will take all reasonable steps to minimize any inconvenience to Landlord caused by such construction. Landlord shall not be obligated to expend any sums for repairs, replacements or rebuilding which are greater than the proceeds of any insurance policy carried by Tenant and Landlord. The "cost of replacement" shall be determined by Tenant and Landlord and the carriers providing coverage. If the proceeds of insurance recovered or recoverable shall be insufficient to pay fully for the cost of replacement of the building, or the building shall be damaged as a result of a risk not covered by Tenant's and Landlord's insurance then, in any such event, Landlord may at its option terminate this Lease by notice to Tenant in writing.

   **8.7 Partial Destruction.** If the Premises shall be damaged by Casualty to the extent of less than fifty percent (50%) of the cost of replacement, by Casualty covered by Tenant's policy of fire and extended coverage insurance during the term of this Lease, except for the last two (2) years of the then current Term of this Lease (whether the initial Term, or if previously exercised by Tenant, an Option Period), then the Tenant shall restore the Premises utilizing the insurance proceeds held by Landlord and Tenant.

   **8.8 Condemnation.** If (i) all of the Premises are taken by a condemnation or otherwise for any public or quasi-public use, (ii) any substantial part of the Premises is so taken and the remainder thereof is insufficient for the reasonable operation of Tenant's business, or (iii) any of the Premises is so taken, and, in Landlord's opinion, it would be impractical or the condemnation proceeds are insufficient, to restore the remainder of the Premises, then this Lease shall terminate. In addition, if more than 25% of the parking spaces at the Premises are taken by a condemnation or otherwise for any public or quasi-public use, and, in Tenant's opinion, the remaining parking spaces are insufficient for the reasonable operation of Tenant's business, then Tenant may elect to terminate this Lease. In the event only a part of the Premises shall be taken or condemned as described herein and the Lease has not been terminated as provided above, then Landlord and Tenant shall promptly cooperate in repairing and restoring the Premises to an architectural and landscaped unit as nearly similar to the condition of the Premises prior to such taking or conveyance as possible. Any award paid as a consequence of such condemnation or conveyance shall be utilized to restore and repair the Premises and the rent shall be equitably adjusted between the parties to reflect any reduction in area of the Premises as of the date of the taking. All compensation awarded or paid upon such a total or partial taking of the Premises shall belong to and be the property of the Landlord without any participation by the Tenant and Tenant hereby waives all rights or interests in such compensation and assigns same to Landlord; provided, however, that nothing contained herein shall be construed to preclude the Tenant, as permitted by law, from prosecuting any claim directly against the condemning authority in such condemnation proceedings for loss of business, relocation costs or depreciation to, damage to, or cost or removal of, or for the value of stock, trade fixtures, furniture, and other personal property belonging to Tenant, or other such action as may be permitted by law, provided same does not diminish Landlord's condemnation compensation in any way.

**ARTICLE 9**
**TAXES, IMPOSITIONS AND UTILITY CHARGES**

2377438-08

**9.1    Taxes and Assessments.** During the Term, Tenant will pay, bear, and discharge, before the delinquency thereof, all taxes and assessments, general and special, if any, which may be taxed, charged, levied, assessed or imposed upon or against or be payable for or in respect of the Premises, or any part thereof, or any improvements at any time thereon or Tenant's interest in the Premises under this Lease, including all water and sewer charges and assessments, and if the method of assessment of such taxes and/or assessments ever changes, the replacement taxes therefor. If any special assessments or similar taxes are levied and assessed that may be paid in installments, Tenant will be required to pay such installments thereof as become due and payable during the life of this Lease as and when the same become due and payable. Taxes and assessments for the years in which the Term of this Lease commences and will expire will be prorated between Landlord and Tenant so that Tenant will pay only that portion thereof attributable to the period on and after the Commencement Date and prior to the date of termination of this Lease.    For taxes and assessments for periods on and after the Commencement Date previously paid by Landlord, Tenant shall reimburse Landlord within ten (10) of Tenant's receipt of notice of such amount together with a copy of the applicable tax bill.

**9.2    Contesting Impositions.** Tenant may, if in good faith it disputes the validity or amount of any utility charge, tax or assessment that Tenant is required to bear, pay or reimburse under this Lease, at its sole cost and expense, contest the same by reasonable and appropriate means. Landlord and Tenant will cooperate in any such contest or review and will join in any such contest or review if required by law or regulations and further will execute and acknowledge such documents, instruments, assents and other papers as may be required or necessary. The legal proceedings referred to in this Article will include appeals from any judgments, decrees, or orders and such review or determinations of any administrative bodies or officers as may be appropriate. Landlord may request that taxing authorities send real estate tax notices and bills pertaining to the Premises to Tenant at Tenant's address and in such case Tenant will send a copy of such notices and bills to Landlord immediately upon Tenant's receipt of the same.

**9.3    Landlord's Taxes.** Tenant will not be obligated to pay any income, profits, excise, franchise or other similar tax or change that may be payable by or chargeable to Landlord under any present or future law of any taxing authority having jurisdiction over the area in which the Premises are located, nor will Tenant be obligated to pay any inheritance, transfer, estate, or succession tax or charge payable by Landlord, except to the extent imposed in lieu of the taxes and assessments payable by Tenant as provided in Section 9.1 above.

**9.4    Utilities.** Tenant shall, at Tenant's sole cost and expense, contract in its own name and pay for all electric current, telephone, trash, water, gas, sewer and other utility services used or consumed by Tenant in the Premises, together with all taxes or other charges levied on or associated with such utilities. In case any such utility charges are not paid by Tenant, then Landlord may pay the same to the utility company or department furnishing such utility, and any amounts so paid by Landlord are hereby agreed and declared to be additional rent payable hereunder that shall be due and payable with the next installment of rent thereafter

falling due under this Lease. Landlord shall not be liable in damages or otherwise for the quality, quantity or interruption of any utility or other services to the Premises. The construction, erection and location of all utilities, including poles wires, conduits, and pipes, serving the Premises from any point in or adjacent to the Premises shall be subject at all times to the approval of Landlord. Tenant's use of electric energy in the Premises shall not at any time exceed the capacity of any of the electrical conductors and equipment in or otherwise serving the Premises. In order to insure that such capacity is not exceeded and to avert possible adverse effect upon the electric service, Tenant shall not connect any additional fixtures, appliances or equipment to the building electric distribution system that would result in the capacity thereof being exceeded and shall not, without Landlord's prior written consent, make any alteration or addition to the electric system of the Premises. In connection with any additions or alterations to the electrical system so approved by Landlord, Tenant shall make whatever changes are necessary to such system and facilities to comply with the requirements of the insurance underwriters and governmental authorities having jurisdiction over the Premises.

## ARTICLE 10
## ESTOPPEL CERTIFICATES

Tenant agrees to furnish Landlord from time to time, on not less than five (5) business days' prior written request by Landlord, an estoppel statement in form required by Landlord that as of the date of such statement, certifying that this Lease is unmodified and in full force and effect, or that the Lease is in full forced and effect as modified and listing the instruments of modification; the dates to which the rents and charges have been paid; Landlord and Tenant have performed and observed all of the covenants and conditions in this Lease stated to be performed and observed by Tenant or Landlord, and that as of such date the leasehold estate hereby created and granted to Tenant by Landlord is free of all defaults under this Lease (or if defaults exist, specifying the nature of the default); and such other statements as may be reasonably requested by Landlord, Landlord's mortgagee, a prospective purchaser of the Premises, or a similar third party. It is intended that any such statement delivered pursuant to this Article may be relied on by Landlord, a prospective purchaser of Landlord's interest or mortgagee of Landlord's interest or assignee of any mortgage of Landlord's interest.

## ARTICLE 11
## DEFAULTS

**11.1  Defaults by Tenant.** If Tenant shall: (i) fail to pay any installment of Base Rent, any Additional Rent, or any payments otherwise due hereunder, within five (5) days of the date when such payment shall become due, or (ii) fail to promptly keep and perform any covenant of this Lease strictly in accordance with its terms and shall continue in default thereof for a period of thirty (30) days after written demand by Landlord for performance (unless the same cannot with due diligence be cured within a period of thirty (30) days, and Tenant, prior to the expiration of thirty (30) days from and after the receipt of Landlord's demand for performance, commences to cure such failure and thereafter diligently prosecutes same to completion, in which event Tenant shall have up to an additional thirty (30) days to cure such default); (iii) become insolvent or fail to vacate or stay the appointment of a receiver or

2377438-08

liquidator or a petition in bankruptcy filed by any party including Tenant; (iv) make an assignment for the benefit of creditors; (v) at any time during the Term fails to maintain the insurance coverages required by this Lease, (vi) vacate the Premises for a period of thirty (30) days or more, or (vii) after the date the restaurant first opens for business to the public, fails to have liquor available for retail sale at the Premises for a period of thirty (30) consecutive days or after the Liquor License has been transferred to Tenant, Tenant fails to hold a retail consumption liquor license permitting the sale of liquor at the Premises, it shall be deemed an "Event of Default".

**11.2 Landlord's Remedies.** Upon the occurrence of any Event of Default, Landlord, in addition to all other rights and remedies provided by or permitted by law, or elsewhere conferred in this Lease, may elect any one or more of the remedies provided in this Section, which may be exercised without further notice or demand to Tenant. Any or all of the rights and remedies available to Landlord may be pursued successively or concurrently as Landlord may elect.

    **(a)**     The Term herein and all rights of the Tenant hereunder and all rights of the Tenant to the continued occupation of the Premises shall cease and terminate at the option of the Landlord. Landlord shall have the right and authorization, without Tenant's consent or cooperation to draw against the Security Deposit in any such amount as is required in Landlord's sole discretion to make Landlord whole.

    **(b)**     Landlord may require that Tenant peaceably quit and surrender the Premises to the Landlord, and the Landlord may, upon prior notice, enter upon, re-enter, and repossess the same by summary proceedings, ejectment or other legal proceedings, and again have, possess and enjoy the same as if this Lease had not been made, and in any such event neither the Tenant nor any person claiming through or under the Tenant by virtue of any law or an order of any court shall be entitled to possession or to remain in possession of the Premises, and the Landlord, may elect (in lieu of all other claims and remedies for lost Basic Rent on account of such termination) as and for liquidated damages for the period of time after the date of termination, an amount equal to the excess of all rents reserved hereunder for the unexpired portion of the Term of this Lease over the fair rental value of the Premises at the time of termination for such unexpired portion of the Term (less the greater of six (6) months or the length of time then reasonably expected to procure a new tenant under prevailing market conditions), said resulting sum discounted to the then present worth at an interest rate per annum equal to the Lease Interest Rate less ten (10%) percent. Rent shall continue to accrue in accordance with the terms hereof up to the date of such termination. Nothing herein contained shall limit or prejudice the right of the Landlord, in any bankruptcy or reorganization or insolvency proceeding, to prove for and obtain as liquidated damages by reason of such termination an amount equal to the maximum allowed by any bankruptcy or reorganization or insolvency proceedings, or to prove for and obtain as liquidated damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law provided such amount shall not exceed the amount set forth above.

2377438-08

(c)    Landlord may take possession of the Premises pursuant to legal proceedings or any notice provided for by law, and at its option make such alterations and repairs as Landlord shall determine may be necessary in order to relet all or any portion of the Premises and to relet the Premises or any part thereof for such term or terms (which may be for a term extending beyond the Term of this Lease), at such rental or rentals and upon such other terms and conditions as Landlord in its discretion may deem advisable. Upon each such reletting, all rental received by Landlord shall be applied as follows: first, to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; second, to the payment of any costs and expenses of such reletting, including any brokerage fees or attorneys' fees and any cost of such alterations and repairs; and third, to the payment of rent and other charges due and unpaid hereunder. The residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder. If the rentals received from such reletting during any month are less than that to be paid during that month by Tenant hereunder, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. No re-entry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease unless a written notice of such intention is given to Tenant or unless the termination hereof is decreed by a court of competent jurisdiction. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous default. Should Landlord at any time terminate this Lease for any default, then in addition to any other remedies Landlord may have, Landlord may recover from Tenant all damages Landlord may incur by reason of such default, including the cost of recovering possession of the Premises, reasonable attorney's fees, and the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this Lease for the remainder of the stated term over the then reasonable rental value of the Premises for the remainder of the stated term, all of which amounts shall be immediately due and payable from Tenant to Landlord.

(d)    **Upon the occurrence of an** Event of Default or threatened default by Tenant of any of the agreements, terms, covenants or conditions contained in this Lease, Landlord shall be entitled to enjoin such Event of Default or threatened default and shall have the right to invoke any right or remedy allowed at law or in equity or by statute or otherwise as though re-entry, summary dispossess proceedings, and other remedies were not provided for in this Lease. During the pendency of any proceedings brought by Landlord to recover possession by reason of an Event of Default, Tenant shall continue all payments required to be made to Landlord, and Landlord shall accept such payments as amounts equal to Base Rent and Additional Rent for use and occupancy of the Premises. In such event, Tenant waives its right in such proceedings to claim as a defense that the receipt of such money payments by Landlord constitutes a waiver by Landlord of such Event of Default.

(e)    Landlord shall have the right to include all monetary obligations of Tenant hereunder in its determination of damages, and nothing herein contained shall be deemed to require the Landlord to wait to begin such action or other legal proceedings until the date when this Lease would have expired had there not been an Event of Default.

2377438-08

(f)    If after any Event of Default, or upon the expiration of the Lease, the Tenant moves out or is dispossessed, and fails to remove any furniture, fixtures or other property from the Premises, the same shall be deemed abandoned by the Tenant and shall become the property of the Landlord or Landlord may at its option remove any or all of said furniture, fixtures or other property in any manner it shall choose and store the same without liability for loss thereof, and Tenant shall pay Landlord, on demand, any and all expenses incurred in such removal and also storage of the same for any length of time during which the same shall be in Landlord's possession or in storage.

11.3    **Payment of Expenses.** In addition to any other remedies Landlord may have at law or equity and/or under this Lease, Tenant shall pay upon demand all of Landlord's costs, charges and expenses, including fees of counsel, agents and others retained by Landlord, incurred in connection with the recovery of sums due under this Lease, because of a default under this Lease, or for any other relief against Tenant. In the event Tenant shall bring any action against Landlord for relief hereunder and Tenant shall fail to obtain a final, unappealable judgment against Landlord, or if Tenant causes any appearance by Landlord as a witness or otherwise in any proceeding, or if Landlord should become a party to any litigation instituted by or against Tenant with respect to any third party, Tenant shall pay reasonable attorneys and professionals fees and expenses and all court costs incurred by Landlord. Tenant's obligations under this Article 11 shall survive the expiration or earlier termination of this Lease.

11.4    **Landlord's Right to Cure Defaults.** If Tenant fails to perform any agreement or obligation on its part to be performed under this Lease, Landlord shall have the right (a) if no emergency exists, to perform the same after giving fifteen (15) days notice to Tenant, and (b) in any emergency situation to perform the same immediately without notice or delay. For the purpose of rectifying Tenant's defaults as aforesaid, Landlord shall have the right to enter the Premises. Tenant shall on demand reimburse Landlord for the costs and expenses incurred by Landlord in rectifying Tenant's defaults as aforesaid, including reasonable attorneys and professionals fees. Except for gross negligence by Landlord, Landlord shall not be liable or in any way responsible for any loss, inconvenience, annoyance or damage resulting to Tenant or anyone holding under Tenant for any action taken by Landlord pursuant to this Article. Any act or thing done by Landlord pursuant to this Article shall not constitute a waiver of any such default by Tenant or a waiver of any covenant, term or condition herein contained or the performance thereof.

11.5 **Waiver and Subsequent Defaults.** No waiver of any covenant or condition or of the breach of any covenant or condition, with or without knowledge of any breach or default by Tenant, shall be construed as a waiver of such breach or default of Landlord's right to terminate this Lease on account of such default. It is expressly understood that if at any time Tenant shall be in default in any of its covenants or conditions hereunder, an acceptance by Landlord of rental during the continuance of such default or the failure on the part of Landlord promptly to avail itself of such other rights or remedies as Landlord may have, shall not be construed as a waiver of such default, but Landlord may at any time thereafter, if such default continues, terminate this Lease on account of such default in the manner hereinbefore provided.

2377438-08

No covenant, term or condition of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing by Landlord.

**11.6    Right of Entry.** Landlord or its agents shall have the right to enter the Premises at all reasonable times (upon at least twenty-four (24) hours' notice, unless there is an emergency) to examine the same, to show the Premises to prospective purchasers, mortgagees or lessees, to enforce or carry out any provisions of this Lease, and to make such repairs, replacements, alterations, improvements or additions to the Premises as Landlord may deem necessary that Tenant has covenanted herein to do and has failed so to do. Landlord shall be allowed to take all material into and upon the Premises that may be required therefore without the same constituting an eviction of Tenant in whole or part. The Rent shall not abate while such repairs, alterations, improvements or additions are being made by reason of loss or interruption of business of Tenant or otherwise. During the six (6) months prior to the expiration of the Term, Landlord may exhibit the Premises to prospective tenants or purchasers. If Tenant shall not be personally present to open and permit an entry into the Premises, at anytime, when for any reason entry therein shall be necessary by emergency, Landlord or Landlord's agents may forcibly enter the same without rendering Landlord or such agents liable therefore and without in any manner affecting the obligations and covenants of this Lease. Nothing contained herein, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever for the care, maintenance or repair of the building or Premises or any part thereof, except as otherwise herein specifically provided. If, prior to the end of the Term, Tenant shall have removed all or substantially all, of Tenant's property therefrom, Landlord may immediately enter, renovate and redecorate the Premises without elimination or abatement of Rent or the payment of other compensation to Tenant and such action shall have no effect upon this Lease.

## ARTICLE 12
## MISCELLANEOUS

**12.1    Brokerage Fees.**    It is understood and agreed that there will be no real estate commissions or other like fees or charges to be paid by Tenant or Landlord in connection with this Lease, and each of the parties agree to indemnify and hold the other harmless against any and all claims, damage and expenses in connection with a breach of such representations. Landlord and Tenant each warrants and represents to the other that it has had no dealings with any real estate broker, agent or licensed sales person in connection with this Lease Agreement.

**12.2    Exhibits.** All exhibits referenced herein are included in this Lease by reference and made a part of this Lease.

**12.3    Applicable Law and Construction.** This Lease shall be interpreted, governed by, and enforced in accordance with the laws of the State of New Jersey.  Tenant consents to the personal jurisdiction of any court of the State of New Jersey or of the District Court for the federal District of New Jersey in any dispute arising from this Lease or the obligations of either party hereunder.  Tenant consents to the service of process through certified

2377438-08

mailing to Tenant's address first set forth above.

**12.4    Holding Over.** Tenant shall have no right to hold over at the expiration of the Term. If Tenant remains in possession without the prior consent of Landlord, Tenant's status shall be that of a mere licensee, and Tenant shall be subject to damages that Landlord might suffer arising out of Tenant's continued occupancy of the Premises. During such holdover period Tenant shall pay to Landlord on a monthly basis 150% of the Rent of the month immediately prior to the end of the Term, plus costs, expenses and fees incurred by Landlord in causing Tenant to vacate said Premises.  In the event Landlord is unable to re-let the Premises due to Tenant's default or failure to perform hereunder, then the holdover period shall be that period until Tenant's default or failure to perform is remedied by Tenant (or, if Landlord elects to cure the same at Tenant's expense, Landlord), including the performance of maintenance, repairs, and/or replacements which Tenant failed to perform during the Term as required by this Lease. Tenant hereby waives notice to vacate the Premises and agrees that Landlord shall be entitled to the benefit of all provisions of law respecting the summary recovery of possession from a Tenant holding over to the same extent as if statutory notice had been given. Upon (a) any termination of this Lease, whether by lapse of time or by the exercise of any option by Landlord to terminate the same or in any manner whatsoever, or (b) any termination of Tenant's right of possession without termination of this Lease, Tenant shall immediately surrender possession of the Premises to Landlord and immediately vacate the same, and remove all effects therefrom, except such as may not be removed under other provisions of this Lease. If Tenant fails to surrender possession and vacate as aforesaid, Landlord may forthwith re-enter the Premises, and repossess itself thereof as in its former estate and expel and remove Tenant and any other personal property therefrom, using such force as may be necessary, without being deemed guilty of trespass, eviction, conversion or forcible entry and without thereby waiving Landlord's rights to rent or any other rights given Landlord under this Lease or at law or in equity.

**12.5    Successors.** Except as otherwise expressly provided, all rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors and permitted assigns of the parties. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing as provided herein.

**12.6    Landlord's Covenant.** Upon timely payment by Tenant of the rent and other charges herein provided and upon observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Premises for the term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease.

**12.7    Accord and Satisfaction.** No payment by Tenant or receipt by Landlord of a lesser amount than the rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction. Landlord at

2377438-08

its sole and absolute discretion may apply any payment received from Tenant in any manner Landlord elects. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided in this Lease.

**12.8   Entire Agreement.** The Lease and all exhibits attached hereto and forming a part hereof, together with any rules and regulations adopted and promulgated by Landlord, set forth all the covenants, promises, agreements, assurances, representations, warranties, statements, conditions and understandings (the "Representations") between Landlord and Tenant concerning the Premises. There are no Representations, either oral or written, between Landlord and Tenant other than as are herein set forth. This Lease supersedes and revokes all previous negotiations, arrangements, offers, proposals, brochures, representations and information conveyed, whether oral or written, between the parties hereto or their representations, and Tenant acknowledges that it has not been induced to enter into this Lease by any Representations not set forth herein and has not relied on any such Representations. Landlord shall have no liability for any consequences arising as a result of any such Representations. Specifically, but without limitation, Tenant acknowledges that Tenant has relied solely on its own investigation and business judgment in its determination to enter into this Lease, that any statements which may have been made by any representative of Landlord concerning the success of Tenant's business or the extent of Tenant's sales or profits is based upon that representative's expectations and are not to be considered as promises, covenants or guarantees of success. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

**12.9   Relationship of the Parties.** Landlord does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business, or otherwise, or joint venturer or a member of a joint enterprise with Tenant whatsoever, or become a principal or agent of Tenant. It is expressly understood and agreed that neither the computation of rent nor any other provisions contained in this Lease nor any act or acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

**12.10   Notices.** Any notice, demand, request, payment, communication or other instrument which may be or is required to be given under this Lease shall be delivered in person or sent by United States certified mail, return receipt requested, postage prepaid, or by any overnight or express mail service that provides receipts to indicate delivery, and shall be addressed (a) if to Landlord, at the "Landlord Address" set forth in Article 1, or at such other address as Landlord may designate by written notice, and (b) if to Tenant, at the "Tenant Address" set forth in Article 1, or at such other address as Tenant shall designate by written notice. All notices sent as provided above shall be effective upon receipt or refusal of delivery.

**12.11   Captions, Article, and Section Numbers.** The captions, titles, section numbers, and article numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such

2377438-08

sections or articles for this Lease or in any way affect this Lease.

**12.12  Use of Pronoun.** The use in this Lease of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, or a group of two or more individuals or business entities. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or Tenant and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed. Unless the context otherwise requires, the word 'person' shall include a corporation, firm or association.

**12.13  Partial Invalidity; Survival.** Each term and each provision of this Lease to be performed by Tenant shall be construed to be both an independent covenant and a condition. If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.  In addition, the Landlord may pursue the relief or remedy sought in any invalid clause, by conforming the said clause with the provisions of the statutes or the regulations of any governmental agency in such case made and provided as if the particular provisions of the applicable statutes or regulations were set forth herein at length.  All of the terms and conditions set forth in this Lease shall apply throughout the Term and survive the expiration thereof unless otherwise expressly set forth herein.

**12.14  Recording.** Tenant shall not record this Lease without the written consent of Landlord.

**12.15  Authority.** Tenant warrants and represents to Landlord that Tenant is a duly formed New Jersey limited liability company  and is authorized to do business in the State of New Jersey; and that Tenant's execution of this Lease is pursuant to authority given by the Tenant's members and/or managers as required by Tenant's organizational documents.

**12.16  Liability of Landlord.** Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed by the parties that neither Landlord nor any of its partners, employees, officers, directors, representatives, managers, agents, trusts, trustees or beneficiaries shall have any personal liability whatsoever with regard to any provision of this Lease or any obligation or liability arising from or in connection with this Lease in the event of a breach or default by Landlord of any of its obligations. Tenant shall look solely to the interest of Landlord in the Premises for the satisfaction of each and every remedy of Tenant.  The word "Landlord" as used herein includes the Landlord named above as well as its successors and assigns, each of which shall have the same rights, remedies, powers, authorities and privileges as it would have had it originally signed this Lease as Landlord.  Any such person or entity, whether or not named herein, shall have no liability hereunder after it ceases to hold

2377438-08

title to the Premises except for obligations already accrued (and, as to any unapplied portion of the Security Deposit, Landlord shall be relieved of all liability therefor upon transfer of such portion to its successor in interest) and Tenant shall look solely to Landlord's successor in interest for the performance of the covenants and obligations of the Landlord hereunder which thereafter shall accrue.

    **12.17. Counterparts.** This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

    THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, OR TENANTS USE AND OCCUPANCY OF THE PREMISES. IF LANDLORD COMMENCES ANY PROCEEDING AGAINST TENANT FOR NON-PAYMENT OF RENT PAYABLE HEREUNDER, THEN TENANT WILL NOT INTERPOSE ANY NONCOMPULSORY COUNTERCLAIM OF ANY NATURE OR DESCRIPTION IN SUCH PROCEEDING; PROVIDED, HOWEVER, THE TERMS OF THIS SENTENCE SHALL NOT PRECLUDE TENANT FROM ASSERTING ANY SUCH COUNTERCLAIMS IN A SEPARATE ACTION BROUGHT BY TENANT.

    [Signature page(s) follows.]

**IN WITNESS WHEREOF,** the parties have caused this Lease to be executed by their duly authorized representatives.

LANDLORD:
Lim Chew Corp.

By: _Mee Yung Lam_
Name: MEE YUNG LAM
Title: PRESIDENT

TENANT:
Circle 10 Restaurant LLC

By: _____
Name: Robert Kurtz
Title: managing member

_____
managing member

2377438-08

**<u>Exhibit A</u>**

Description/Depiction of the Premises

(See attached.)

# Tax Map



**<u>Exhibit B</u>**

Form of Promissory Note for Liquor License

(See attached.)

# PROMISSORY NOTE

$500,000                                                                    Roseland, New Jersey
                                                                            Dated: October 20, 2010

FOR VALUE RECEIVED, **CIRCLE 10 RESTAURANT LLC**, a New Jersey limited liability company (the "Maker") promises to pay to the order of **Lim Chew Corp.**, a New Jersey corporation (the "Holder"), the principal sum of **FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000.00)** or so much thereof as may be outstanding (the "Principal Sum" or the "Loan"), in immediately available funds and in lawful money of the United States of America, together with all accrued and unpaid interest, as hereinafter provided. All payments shall be payable to Lim Chew Corp., a New Jersey corporation, 276 Eisenhower Parkway, Livingston, New Jersey 07039, or at such other place as Holder may from time to time designate in writing.

1. **The Liquor License**. This Note arises out of the transfer of that certain New Jersey Alcoholic Beverage Retail Consumption Liquor License issued by the Township of Livingston, Essex, New Jersey and designated as License No. 0710 - 33 - 020 — 005 (the "License"), with Holder, as seller, and Maker, as buyer, the terms for the transfer being set forth in that certain lease agreement (the "Lease") dated October 20, 2010, entered into by and between Maker, as tenant, and Holder, as landlord, regarding the premises (the "Premises") located at 372 W. Mount Pleasant Avenue, Livingston, New Jersey and more particularly described in the Lease. Holder is conveying to the Maker the License in return for delivery of this Note, performance of the covenants hereunder, in the ROFR (as defined below), and in the Lease, and a lump sum payment to Holder of $100,000.

2. **Principal and Interest Payments**. Principal and interest are payable under this Note in eighty-four (84) equal payments each in the amount of $8,044.54(each payment to be allocated between principal and interest as set forth on Exhibit A), with the first payment due on the Rent Commencement Date (as defined in the Lease) (the "Initial Payment Due Date"), and with each succeeding payment due on the first day of each month following the month in which the Initial Payment Due Date occurs, with the first day of the eighty-third month following the month in which the Initial Payment Due Date occurs being the Maturity Date (the "Maturity Date").

3. **Maturity Date**. All indebtedness due on this Note, if not sooner paid and unless sooner due as hereinafter provided, shall be due and payable by Maker upon the Maturity Date. Maker agrees that no transfer of the License shall relieve the original Maker of liability under this Note.

4. **Application of Payments**. Other then with respect to regularly scheduled payments which shall be applied as provided in Section 2 above, all payments shall be applied first to the payment of costs of collection (if any), then to interest accrued and unpaid under this Note, and then to principal of this Note or as otherwise determined by Holder.

5.  **Prepayments.**  This Note may be prepaid in whole by Maker paying to Holder the sum of all monthly principal payments listed on Exhibit A not previously paid by Maker to Holder (the "Prepayment Amount").  Any partial prepayment shall require the express consent of the Lender

6.  **Events of Default.**

(a)  **Events of Default.**  As used herein, the term "Event of Default" shall mean:

(i)  Maker fails to make any payment due under this Note within five (5) days of the date the same is due and payable;

(ii)  Maker fails to perform or observe any covenant or agreement to be performed or observed by it under this Note and such failure continues uncured for more than thirty (30) days following receipt of written notice of such failure; or

(iii)  The License is revoked or terminated by any applicable authorities; or

(iv)  Maker becomes insolvent or fails to vacate or stay the appointment of a receiver or liquidator or a petition in bankruptcy filed by any party including Maker; or

(v)  Maker makes an assignment for the benefit of creditors; or

(vi)  An Event of Default occurs under the Lease (as defined therein); or

(vii)  An Event of Default under and as defined in that certain Right of First Refusal Agreement (the "ROFR") dated October 20, 2010, entered into by and between Maker, as seller, and Holder, as buyer, regarding the License; or

(viii)  This Note shall cease, for any reason, to be in full force and effect, or this Note shall not give or shall cease to give the Holder, the rights, powers and privileges purported to be created hereby.

(b)  **Effect of Event of Default.**  If an Event of Default by Maker shall occur, then, and in any such event, in addition to any and all remedies available by law and/or under the Lease, the entire principal amount outstanding shall at once become due and payable at the option of Holder, without further notice or demand.  Holder may exercise this option to accelerate following any Event of Default by Maker regardless of any prior forbearance.  In addition, and without limitation of any other rights and/or remedies of Holder, Holder, or at Holder's election, Holder's assignee or nominee, shall have the right to acquire the License on and subject to the terms set forth in Section 2.4 of the Lease.

(c)  **Default Interest Rate, Remedies.**  If Maker shall fail to pay when due and payable any amount under this Note to Holder, including sums expended by Holder to cure a default by Tenant hereunder, and such non-payment shall continue for 5 days thereafter, such unpaid amounts shall bear interest from the date Maker's payments are first due to the date of payment at: (i) the prime rate announced, from time to time, by JPMorgan Chase Manhattan Bank, N.A. (or a similar institution if JPMorgan Chase Manhattan Bank, N.A. is not then in existence) plus

2

ten (10%) percent, or (ii) the maximum lawful interest rate, whichever is less, per annum. Failure of Holder to exercise any remedy available to it shall not constitute a waiver of the right to exercise the same in the event of the same or subsequent default. The rights and remedies available to Holder hereunder are cumulative and may be exercised together, separately, and in any order. Each right, power, or privilege specified or referred to in this Note is in addition to and not in limitation of any other rights, powers, and privileges that Holder may otherwise have or acquire by operation of law, by other contract, or otherwise.

7.    **No Setoff.**  Maker hereby waives any and all now existing or hereafter arising rights to recoup or offset any obligation of Maker under or in connection with this Note against any claim or right of Maker against Holder, provided that nothing herein shall prevent Maker from pursuing its claim against Holder by all other lawful means.

8.    **Waiver.**  Presentment, demand, protest, notice of dishonor and protest are hereby waived by all makers, sureties, guarantors and endorsers hereof. This Note shall be binding upon Maker and its successors and assigns. No delay, omission or failure on the part of Holder in exercising any right or remedy hereunder shall operate as waiver of such right or remedy or any other right or remedy of Holder hereunder. Holder and Maker acknowledge that this Note is not made for the benefit of any third party.

9.    **Notices.**  Any notice, demand, request, payment, communication or other instrument which may be or is required to be given under this Lease shall be delivered in person or sent by United States certified mail, return receipt requested, postage prepaid, or by any overnight or express mail service that provides receipts to indicate delivery, and shall be addressed (a) if to Maker, at 8 Tarlton Drive, Livingston, NJ 07039, or at such other address as Maker may designate by written notice, and (b) if to Holder, at 276 Eisenhower Parkway, Livingston, New Jersey 07039, or at such other address as Holder shall designate by written notice. All notices sent as provided above shall be effective upon receipt or refusal of delivery.

10.    **U.S. Dollars.**  All amounts owing on this Note shall be payable in lawful and immediately available funds of the United States of America.

11.    **Attorneys' Fees.**  Maker will reimburse Holder, on Holder's demand from time to time, for any and all fees, costs, and expenses (including, without limitation, the fees and disbursements of legal counsel) incurred by Holder in protecting and enforcing its rights under this Note following an Event of Default by Maker.

12.    **Governing Law.**  This Note shall be governed by and construed according to the laws of the State of New Jersey.

13.    **Jurisdiction and Venue; Waiver of Jury Trial.**  Any action, claim, counterclaim, crossclaim, proceeding, or suit, whether at law or in equity, whether sounding in tort, contract, or otherwise at any time arising under or in connection with this Note, the administration, enforcement, or negotiation of this Note, or the performance of any obligation in respect of this Note (each such action, claim, counterclaim, crossclaim, proceeding, or suit, an "Action") may be brought in any federal or state court located in the State of New Jersey. Maker hereby unconditionally submits to the jurisdiction of any such court with respect to each such

2387655-03

Action and hereby waives any objection Maker may now or hereafter have to the venue of any such Action brought in any such court. MAKER HEREBY, AND EACH HOLDER OF THIS NOTE, BY TAKING POSSESSION THEREOF, KNOWINGLY AND VOLUNTARILY WAIVES JURY TRIAL IN RESPECT OF ANY ACTION.

14.    **Severability**. Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

15.    **No Oral Waiver, Modification or Cancellation**. No provision in this Note may be waived, modified or cancelled orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification, discharge or cancellation is sought. Such waiver or consent shall, in any event, be effective only in the specific instance and for the purpose for which it was given. No notice to or demand on the Maker in any case shall, of itself, entitle the Maker to any other or further notice or demand in similar or other circumstances.

16.    **Limitation on Interest**. Notwithstanding any provision to the contrary, the rate of interest which Maker shall be required to pay to Holder shall in no event, contingency or circumstance exceed the maximum rate permitted under the laws of the State of New Jersey. If, from any circumstance whatsoever, performance by Maker of any obligation on this Note at the time performance shall be due (including, without limiting the generality of the foregoing, the payment of any fee, charge or expense paid or incurred by Maker which shall be held to be interest) shall involve transcending the limits of validity prescribed by law, then, automatically, such obligation to be performed shall be reduced to the limit of such validity prescribed by law. If, notwithstanding the foregoing limitations, any excess interest shall at the maturity of the Note be determined to have been received, the same shall be deemed to have been held as security by Holder. To the extent that, pursuant to the foregoing, the Holder shall receive accrued interest hereunder in an amount less than the amount otherwise provided, such deficit (the "Interest Deficit") will accumulate and will be carried forward (without interest) until this Note is paid in full. Interest otherwise payable to the Holder hereunder for any subsequent period shall be increased by the maximum amount of the Interest Deficit that may be so added without causing the Holder to receive interest in excess of the maximum amount then permitted by law. The foregoing provisions shall never be superseded or waived and shall control every other provision of all agreements between Holder and Maker.

17.    **Assignment**. Notwithstanding any other provision in this Note to the contrary, Maker hereby agrees that it shall not have the right to assign its interest or any of its obligations in this Note without the express written consent of the Holder, which may be withheld for any reason. The word "Maker" shall include the Maker's successors and assigns and the word "Holder" shall include the Holder's successors and assigns. Holder shall not withhold its consent to the assignment of this Note by Maker to: (a) a parent or subsidiary or an affiliate controlled by, or under common control with, Maker to which the Lease is assigned in accordance with the terms of the Lease and as permitted thereunder; (b) any person or entity to which the Lease is assigned or sublet pursuant to the terms of the Lease in conjunction with an assignment or sublease of the Premises in accordance with the terms of the Lease and as

permitted thereunder; provided, however, any such assignee under the foregoing clauses (a) and (b) must, prior to or simultaneously with such assignment, assume in writing the obligations under this Note in form satisfactory to Holder, must be eligible to hold a liquor license in the State of New Jersey and must comply with any and all laws, rules and regulations governing the License including those relating to its transfer (the "Permitted Assignees"). Notwithstanding any assignment of this Note, the Maker shall remain fully liable and shall not be released from performing any of the terms, covenants, conditions and obligations of this Note, including, without limitation, payments of principal and interest.

18.    **Lost Note**. Upon receipt of an affidavit of an officer of the Holder as to the loss, theft, destruction, or mutilation of the Note or any other security document which is not of public record and, in the case of any such loss, theft, destruction or mutilation, upon surrender and cancellation of such Note or other security document, the Maker will issue, in lieu thereof, a replacement Note or other security document in the same principal amount thereof and otherwise of like tenor.

19.    **Maker's Representations and Warranties**.    Maker hereby represents and warrants to Holder, as of the date hereof, the following:

(a)    <u>No Conflict</u>.  Maker has the right, power and lawful authority to issue, execute and deliver this Note.  The execution and delivery of this Note by Maker will not violate any provisions of law, regulation, order of any court or any other agency of government binding on Maker, nor shall this Note violate, breach, conflict with or result in a breach of any of the material terms, conditions or provisions of any agreement, obligation or other instrument to which Maker is a party, or by which Maker may be bound.

(b)    <u>Validity of Instrument</u>.  This Note constitutes the legal, valid and binding obligation of Maker enforceable against Maker in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or equitable principles relating to or limiting creditors' rights generally.

20.    IN CONSIDERATION OF THE AGREEMENTS CONTAINED HEREIN, TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE MAKER HEREBY WAIVES ANY PROVISIONS APPLICABLE IN CONNECTION WITH ANY VOLUNTARY OR INVOLUNTARY INSOLVENCY, BANKRUPTCY, REORGANIZATION, FRAUDULENT CONVEYANCE, OR SIMILAR PROCEEDING INVOLVING THE MAKER (OR OTHERWISE AFFECTING THE COLLATERAL GIVEN TO THE HOLDER TO SECURE THIS NOTE) UNDER ANY STATE OR FEDERAL LAW REGARDING CREDITORS' RIGHTS OR DEBTORS' OBLIGATIONS IMPOSING AGAINST THE HOLDER, OR OTHERWISE PROVIDING FOR, AN AUTOMATIC STAY UNDER SECTION 362(A) OF THE BANKRUPTCY CODE OR ANY OTHER PROHIBITION AGAINST THE HOLDER'S COMMENCING, MAINTAINING, OR COMPLETING ANY PROCEEDINGS IN CONNECTION WITH OR THE EXERCISE OR ENFORCEMENT OF ANY OF THE HOLDER'S RIGHTS HEREUNDER OR ANY APPLICABLE LAW.  IN FURTHERANCE THEREOF, THE MAKER AGREES (i) THAT, IN THE EVENT OF THE IMPOSITION OF ANY SUCH STAY OR OTHER PROHIBITION, THE HOLDER MAY SEEK TO LIFT ANY SUCH STAY OR OTHER PROHIBITION OR SEEK EXEMPTION THEREFROM, (ii) NOT

TO CONTEST ANY MOTION MADE BY THE HOLDER FOR THE LIFTING THEREOF OR FOR EXEMPTION THEREFROM; AND (iii) TO COOPERATE WITH THE HOLDER, IN ANY MANNER REQUESTED BY THE HOLDER, IN ITS EFFORTS TO OBTAIN RELIEF FROM ANY SUCH STAY OR OTHER PROHIBITION.

6

IN WITNESS WHEREOF, Maker has caused this Note to be duly executed.

**CIRCLE 10 RESTAURANT LLC**
a New Jersey limited liability company

By: _____

Its: _____

"**Maker**"

Witness:

_____

Dated:  October_____, 2010

## Exhibit A

Note Payment Schedule

(See attached.)

Livingston Liquor License Note Pay Down Schedule
To be used as Exhibit A
9.00%

| Month | Beg Principle | Monthly Principal | Monthly Interest | Monthly Payment | End Principal |
|---|---|---|---|---|---|
| | | | | | 500,000.00 |
| 1 | 500,000.00 | $4,294.54 | 3,750.00 | 8,044.54 | 495,705.46 |
| 2 | 495,705.46 | $4,326.75 | 3,717.79 | 8,044.54 | 491,378.71 |
| 3 | 491,378.71 | $4,359.20 | 3,685.34 | 8,044.54 | 487,019.51 |
| 4 | 487,019.51 | $4,391.89 | 3,652.65 | 8,044.54 | 482,627.62 |
| 5 | 482,627.62 | $4,424.83 | 3,619.71 | 8,044.54 | 478,202.79 |
| 6 | 478,202.79 | $4,458.02 | 3,586.52 | 8,044.54 | 473,744.77 |
| 7 | 473,744.77 | $4,491.45 | 3,553.09 | 8,044.54 | 469,253.32 |
| 8 | 469,253.32 | $4,525.14 | 3,519.40 | 8,044.54 | 464,728.18 |
| 9 | 464,728.18 | $4,559.08 | 3,485.46 | 8,044.54 | 460,169.10 |
| 10 | 460,169.10 | $4,593.27 | 3,451.27 | 8,044.54 | 455,575.83 |
| 11 | 455,575.83 | $4,627.72 | 3,416.82 | 8,044.54 | 450,948.11 |
| 12 | 450,948.11 | $4,662.43 | 3,382.11 | 8,044.54 | 446,285.68 |
| 13 | 446,285.68 | $4,697.40 | 3,347.14 | 8,044.54 | 441,588.28 |
| 14 | 441,588.28 | $4,732.63 | 3,311.91 | 8,044.54 | 436,855.66 |
| 15 | 436,855.66 | $4,768.12 | 3,276.42 | 8,044.54 | 432,087.54 |
| 16 | 432,087.54 | $4,803.88 | 3,240.66 | 8,044.54 | 427,283.65 |
| 17 | 427,283.65 | $4,839.91 | 3,204.63 | 8,044.54 | 422,443.74 |
| 18 | 422,443.74 | $4,876.21 | 3,168.33 | 8,044.54 | 417,567.53 |
| 19 | 417,567.53 | $4,912.78 | 3,131.76 | 8,044.54 | 412,654.75 |
| 20 | 412,654.75 | $4,949.63 | 3,094.91 | 8,044.54 | 407,705.12 |
| 21 | 407,705.12 | $4,986.75 | 3,057.79 | 8,044.54 | 402,718.37 |
| 22 | 402,718.37 | $5,024.15 | 3,020.39 | 8,044.54 | 397,694.22 |
| 23 | 397,694.22 | $5,061.83 | 2,982.71 | 8,044.54 | 392,632.38 |
| 24 | 392,632.38 | $5,099.80 | 2,944.74 | 8,044.54 | 387,532.59 |
| 25 | 387,532.59 | $5,138.04 | 2,906.50 | 8,044.54 | 382,394.54 |
| 26 | 382,394.54 | $5,176.58 | 2,867.96 | 8,044.54 | 377,217.96 |
| 27 | 377,217.96 | $5,215.40 | 2,829.14 | 8,044.54 | 372,002.56 |
| 28 | 372,002.56 | $5,254.52 | 2,790.02 | 8,044.54 | 366,748.04 |
| 29 | 366,748.04 | $5,293.93 | 2,750.61 | 8,044.54 | 361,454.11 |
| 30 | 361,454.11 | $5,333.63 | 2,710.91 | 8,044.54 | 356,120.48 |
| 31 | 356,120.48 | $5,373.64 | 2,670.90 | 8,044.54 | 350,746.84 |
| 32 | 350,746.84 | $5,413.94 | 2,630.60 | 8,044.54 | 345,332.90 |
| 33 | 345,332.90 | $5,454.54 | 2,590.00 | 8,044.54 | 339,878.36 |
| 34 | 339,878.36 | $5,495.45 | 2,549.09 | 8,044.54 | 334,382.91 |
| 35 | 334,382.91 | $5,536.67 | 2,507.87 | 8,044.54 | 328,846.24 |
| 36 | 328,846.24 | $5,578.19 | 2,466.35 | 8,044.54 | 323,268.05 |
| 37 | 323,268.05 | $5,620.03 | 2,424.51 | 8,044.54 | 317,648.02 |
| 38 | 317,648.02 | $5,662.18 | 2,382.36 | 8,044.54 | 311,985.84 |
| 39 | 311,985.84 | $5,704.65 | 2,339.89 | 8,044.54 | 306,281.20 |
| 40 | 306,281.20 | $5,747.43 | 2,297.11 | 8,044.54 | 300,533.77 |
| 41 | 300,533.77 | $5,790.54 | 2,254.00 | 8,044.54 | 294,743.23 |
| 42 | 294,743.23 | $5,833.96 | 2,210.58 | 8,044.54 | 288,909.27 |
| 43 | 288,909.27 | $5,877.72 | 2,166.82 | 8,044.54 | 283,031.55 |
| 44 | 283,031.55 | $5,921.80 | 2,122.74 | 8,044.54 | 277,109.74 |
| 45 | 277,109.74 | $5,966.22 | 2,078.32 | 8,044.54 | 271,143.53 |
| 46 | 271,143.53 | $6,010.96 | 2,033.58 | 8,044.54 | 265,132.57 |

| | | | | |
|---|---|---|---|---|
| 47 | 265,132.57 | $6,056.04 | 1,988.50 | 8,044.54 | 259,076.52 |
| 48 | 259,076.52 | $6,101.47 | 1,943.07 | 8,044.54 | 252,975.06 |
| 49 | 252,975.06 | $6,147.23 | 1,897.31 | 8,044.54 | 246,827.83 |
| 50 | 246,827.83 | $6,193.33 | 1,851.21 | 8,044.54 | 240,634.50 |
| 51 | 240,634.50 | $6,239.78 | 1,804.76 | 8,044.54 | 234,394.72 |
| 52 | 234,394.72 | $6,286.58 | 1,757.96 | 8,044.54 | 228,108.14 |
| 53 | 228,108.14 | $6,333.73 | 1,710.81 | 8,044.54 | 221,774.41 |
| 54 | 221,774.41 | $6,381.23 | 1,663.31 | 8,044.54 | 215,393.18 |
| 55 | 215,393.18 | $6,429.09 | 1,615.45 | 8,044.54 | 208,964.09 |
| 56 | 208,964.09 | $6,477.31 | 1,567.23 | 8,044.54 | 202,486.78 |
| 57 | 202,486.78 | $6,525.89 | 1,518.65 | 8,044.54 | 195,960.89 |
| 58 | 195,960.89 | $6,574.83 | 1,469.71 | 8,044.54 | 189,386.06 |
| 59 | 189,386.06 | $6,624.14 | 1,420.40 | 8,044.54 | 182,761.92 |
| 60 | 182,761.92 | $6,673.82 | 1,370.72 | 8,044.54 | 176,088.09 |
| 61 | 176,088.09 | $6,723.88 | 1,320.66 | 8,044.54 | 169,364.21 |
| 62 | 169,364.21 | $6,774.31 | 1,270.23 | 8,044.54 | 162,589.91 |
| 63 | 162,589.91 | $6,825.11 | 1,219.43 | 8,044.54 | 155,764.79 |
| 64 | 155,764.79 | $6,876.30 | 1,168.24 | 8,044.54 | 148,888.49 |
| 65 | 148,888.49 | $6,927.88 | 1,116.66 | 8,044.54 | 141,960.61 |
| 66 | 141,960.61 | $6,979.83 | 1,064.71 | 8,044.54 | 134,980.78 |
| 67 | 134,980.78 | $7,032.18 | 1,012.36 | 8,044.54 | 127,948.60 |
| 68 | 127,948.60 | $7,084.92 | 959.62 | 8,044.54 | 120,863.67 |
| 69 | 120,863.67 | $7,138.06 | 906.48 | 8,044.54 | 113,725.61 |
| 70 | 113,725.61 | $7,191.60 | 852.94 | 8,044.54 | 106,534.01 |
| 71 | 106,534.01 | $7,245.53 | 799.01 | 8,044.54 | 99,288.48 |
| 72 | 99,288.48 | $7,299.88 | 744.66 | 8,044.54 | 91,988.60 |
| 73 | 91,988.60 | $7,354.62 | 689.92 | 8,044.54 | 84,633.98 |
| 74 | 84,633.98 | $7,409.78 | 634.76 | 8,044.54 | 77,224.19 |
| 75 | 77,224.19 | $7,465.36 | 579.18 | 8,044.54 | 69,758.84 |
| 76 | 69,758.84 | $7,521.35 | 523.19 | 8,044.54 | 62,237.49 |
| 77 | 62,237.49 | $7,577.76 | 466.78 | 8,044.54 | 54,659.73 |
| 78 | 54,659.73 | $7,634.59 | 409.95 | 8,044.54 | 47,025.14 |
| 79 | 47,025.14 | $7,691.85 | 352.69 | 8,044.54 | 39,333.29 |
| 80 | 39,333.29 | $7,749.54 | 295.00 | 8,044.54 | 31,583.75 |
| 81 | 31,583.75 | $7,807.66 | 236.88 | 8,044.54 | 23,776.09 |
| 82 | 23,776.09 | $7,866.22 | 178.32 | 8,044.54 | 15,909.87 |
| 83 | 15,909.87 | $7,925.22 | 119.32 | 8,044.54 | 7,984.65 |
| 84 | 7,984.65 | $7,984.65 | 59.97 | 8,044.62 | 0.00 |

# Exhibit B

## PROMISSORY NOTE

$500,000

Roseland, New Jersey
Dated: October 20, 2010

FOR VALUE RECEIVED, **CIRCLE 10 RESTAURANT LLC**, a New Jersey limited liability company (the "Maker") promises to pay to the order of **Lim Chew Corp.**, a New Jersey corporation (the "Holder"), the principal sum of **FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000.00)** or so much thereof as may be outstanding (the "Principal Sum" or the "Loan"), in immediately available funds and in lawful money of the United States of America, together with all accrued and unpaid interest, as hereinafter provided.  All payments shall be payable to Lim Chew Corp., a New Jersey corporation, 276 Eisenhower Parkway, Livingston, New Jersey 07039, or at such other place as Holder may from time to time designate in writing.

1.    **The Liquor License.**  This Note arises out of the transfer of that certain New Jersey Alcoholic Beverage Retail Consumption Liquor License issued by the Township of Livingston, Essex, New Jersey and designated as License No. 0710 - 33 - 020 – 005 (the "License"), with Holder, as seller, and Maker, as buyer, the terms for the transfer being set forth in that certain lease agreement (the "Lease") dated October 20, 2010, entered into by and between Maker, as tenant, and Holder, as landlord, regarding the premises (the "Premises") located at 372 W. Mount Pleasant Avenue, Livingston, New Jersey and more particularly described in the Lease.  Holder is conveying to the Maker the License in return for delivery of this Note, performance of the covenants hereunder, in the ROFR (as defined below), and in the Lease, and a lump sum payment to Holder of $100,000.

2.    **Principal and Interest Payments.**  Principal and interest are payable under this Note in eighty-four (84) equal payments each in the amount of $8,044.54(each payment to be allocated between principal and interest as set forth on Exhibit A), with the first payment due on the Rent Commencement Date (as defined in the Lease) (the "Initial Payment Due Date"), and with each succeeding payment due on the first day of each month following the month in which the Initial Payment Due Date occurs, with the first day of the eighty-third month following the month in which the Initial Payment Due Date occurs being the Maturity Date (the "Maturity Date").

3.    **Maturity Date.**  All indebtedness due on this Note, if not sooner paid and unless sooner due as hereinafter provided, shall be due and payable by Maker upon the Maturity Date.  Maker agrees that no transfer of the License shall relieve the original Maker of liability under this Note.

4.    **Application of Payments.**   Other then with respect to regularly scheduled payments which shall be applied as provided in Section 2 above, all payments shall be applied first to the payment of costs of collection (if any), then to interest accrued and unpaid under this Note, and then to principal of this Note or as otherwise determined by Holder.

2387655-03

5.   <u>Prepayments</u>.  This Note may be prepaid in whole by Maker paying to Holder the sum of all monthly principal payments listed on Exhibit A not previously paid by Maker to Holder (the "Prepayment Amount").  Any partial prepayment shall require the express consent of the Lender

6.   <u>Events of Default</u>.

(a)   <u>Events of Default</u>.  As used herein, the term "Event of Default" shall mean:

(i)   Maker fails to make any payment due under this Note within five (5) days of the date the same is due and payable;

(ii)   Maker fails to perform or observe any covenant or agreement to be performed or observed by it under this Note and such failure continues uncured for more than thirty (30) days following receipt of written notice of such failure; or

(iii)   The License is revoked or terminated by any applicable authorities; or

(iv)   Maker becomes insolvent or fails to vacate or stay the appointment of a receiver or liquidator or a petition in bankruptcy filed by any party including Maker; or

(v)   Maker makes an assignment for the benefit of creditors; or

(vi)   An Event of Default occurs under the Lease (as defined therein); or

(vii)   An Event of Default under and as defined in that certain Right of First Refusal Agreement (the "ROFR") dated October 20, 2010, entered into by and between Maker, as seller, and Holder, as buyer, regarding the License; or

(viii)   This Note shall cease, for any reason, to be in full force and effect, or this Note shall not give or shall cease to give the Holder, the rights, powers and privileges purported to be created hereby.

(b)   <u>Effect of Event of Default</u>.  If an Event of Default by Maker shall occur, then, and in any such event, in addition to any and all remedies available by law and/or under the Lease, the entire principal amount outstanding shall at once become due and payable at the option of Holder, without further notice or demand.   Holder may exercise this option to accelerate following any Event of Default by Maker regardless of any prior forbearance.  In addition, and without limitation of any other rights and/or remedies of Holder, Holder, or at Holder's election, Holder's assignee or nominee, shall have the right to acquire the License on and subject to the terms set forth in Section 2.4 of the Lease.

(c)   <u>Default Interest Rate, Remedies</u>.  If Maker shall fail to pay when due and payable any amount under this Note to Holder, including sums expended by Holder to cure a default by Tenant hereunder, and such non-payment shall continue for 5 days thereafter, such unpaid amounts shall bear interest from the date Maker's payments are first due to the date of payment at: (i) the prime rate announced, from time to time, by JPMorgan Chase Manhattan Bank, N.A. (or a similar institution if JPMorgan Chase Manhattan Bank, N.A. is not then in existence) plus

2

ten (10%) percent, or (ii) the maximum lawful interest rate, whichever is less, per annum. Failure of Holder to exercise any remedy available to it shall not constitute a waiver of the right to exercise the same in the event of the same or subsequent default. The rights and remedies available to Holder hereunder are cumulative and may be exercised together, separately, and in any order. Each right, power, or privilege specified or referred to in this Note is in addition to and not in limitation of any other rights, powers, and privileges that Holder may otherwise have or acquire by operation of law, by other contract, or otherwise.

7.    **No Setoff.** Maker hereby waives any and all now existing or hereafter arising rights to recoup or offset any obligation of Maker under or in connection with this Note against any claim or right of Maker against Holder, provided that nothing herein shall prevent Maker from pursuing its claim against Holder by all other lawful means.

8.    **Waiver.** Presentment, demand, protest, notice of dishonor and protest are hereby waived by all makers, sureties, guarantors and endorsers hereof. This Note shall be binding upon Maker and its successors and assigns. No delay, omission or failure on the part of Holder in exercising any right or remedy hereunder shall operate as waiver of such right or remedy or any other right or remedy of Holder hereunder. Holder and Maker acknowledge that this Note is not made for the benefit of any third party.

9.    **Notices.** Any notice, demand, request, payment, communication or other instrument which may be or is required to be given under this Lease shall be delivered in person or sent by United States certified mail, return receipt requested, postage prepaid, or by any overnight or express mail service that provides receipts to indicate delivery, and shall be addressed (a) if to Maker, at 8 Tarlton Drive, Livingston, NJ 07039, or at such other address as Maker may designate by written notice, and (b) if to Holder, at 276 Eisenhower Parkway, Livingston, New Jersey 07039, or at such other address as Holder shall designate by written notice. All notices sent as provided above shall be effective upon receipt or refusal of delivery.

10.    **U.S. Dollars.** All amounts owing on this Note shall be payable in lawful and immediately available funds of the United States of America.

11.    **Attorneys' Fees.** Maker will reimburse Holder, on Holder's demand from time to time, for any and all fees, costs, and expenses (including, without limitation, the fees and disbursements of legal counsel) incurred by Holder in protecting and enforcing its rights under this Note following an Event of Default by Maker.

12.    **Governing Law.** This Note shall be governed by and construed according to the laws of the State of New Jersey.

13.    **Jurisdiction and Venue; Waiver of Jury Trial.** Any action, claim, counterclaim, crossclaim, proceeding, or suit, whether at law or in equity, whether sounding in tort, contract, or otherwise at any time arising under or in connection with this Note, the administration, enforcement, or negotiation of this Note, or the performance of any obligation in respect of this Note (each such action, claim, counterclaim, crossclaim, proceeding, or suit, an "Action") may be brought in any federal or state court located in the State of New Jersey. Maker hereby unconditionally submits to the jurisdiction of any such court with respect to each such

3

Action and hereby waives any objection Maker may now or hereafter have to the venue of any such Action brought in any such court. MAKER HEREBY, AND EACH HOLDER OF THIS NOTE, BY TAKING POSSESSION THEREOF, KNOWINGLY AND VOLUNTARILY WAIVES JURY TRIAL IN RESPECT OF ANY ACTION.

14.    **Severability**. Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

15.    **No Oral Waiver, Modification or Cancellation**. No provision in this Note may be waived, modified or cancelled orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification, discharge or cancellation is sought. Such waiver or consent shall, in any event, be effective only in the specific instance and for the purpose for which it was given. No notice to or demand on the Maker in any case shall, of itself, entitle the Maker to any other or further notice or demand in similar or other circumstances.

16.    **Limitation on Interest**. Notwithstanding any provision to the contrary, the rate of interest which Maker shall be required to pay to Holder shall in no event, contingency or circumstance exceed the maximum rate permitted under the laws of the State of New Jersey. If, from any circumstance whatsoever, performance by Maker of any obligation on this Note at the time performance shall be due (including, without limiting the generality of the foregoing, the payment of any fee, charge or expense paid or incurred by Maker which shall be held to be interest) shall involve transcending the limits of validity prescribed by law, then, automatically, such obligation to be performed shall be reduced to the limit of such validity prescribed by law. If, notwithstanding the foregoing limitations, any excess interest shall at the maturity of the Note be determined to have been received, the same shall be deemed to have been held as security by Holder. To the extent that, pursuant to the foregoing, the Holder shall receive accrued interest hereunder in an amount less than the amount otherwise provided, such deficit (the "Interest Deficit") will accumulate and will be carried forward (without interest) until this Note is paid in full. Interest otherwise payable to the Holder hereunder for any subsequent period shall be increased by the maximum amount of the Interest Deficit that may be so added without causing the Holder to receive interest in excess of the maximum amount then permitted by law. The foregoing provisions shall never be superseded or waived and shall control every other provision of all agreements between Holder and Maker.

17.    **Assignment**. Notwithstanding any other provision in this Note to the contrary, Maker hereby agrees that it shall not have the right to assign its interest or any of its obligations in this Note without the express written consent of the Holder, which may be withheld for any reason. The word "Maker" shall include the Maker's successors and assigns and the word "Holder" shall include the Holder's successors and assigns. Holder shall not withhold its consent to the assignment of this Note by Maker to: (a) a parent or subsidiary or an affiliate controlled by, or under common control with, Maker to which the Lease is assigned in accordance with the terms of the Lease and as permitted thereunder; (b) any person or entity to which the Lease is assigned or sublet pursuant to the terms of the Lease in conjunction with an assignment or sublease of the Premises in accordance with the terms of the Lease and as

4

permitted thereunder; provided, however, any such assignee under the foregoing clauses (a) and (b) must, prior to or simultaneously with such assignment, assume in writing the obligations under this Note in form satisfactory to Holder, must be eligible to hold a liquor license in the State of New Jersey and must comply with any and all laws, rules and regulations governing the License including those relating to its transfer (the "Permitted Assignees"). Notwithstanding any assignment of this Note, the Maker shall remain fully liable and shall not be released from performing any of the terms, covenants, conditions and obligations of this Note, including, without limitation, payments of principal and interest.

18.    **Lost Note**.  Upon receipt of an affidavit of an officer of the Holder as to the loss, theft, destruction, or mutilation of the Note or any other security document which is not of public record and, in the case of any such loss, theft, destruction or mutilation, upon surrender and cancellation of such Note or other security document, the Maker will issue, in lieu thereof, a replacement Note or other security document in the same principal amount thereof and otherwise of like tenor.

19.    **Maker's Representations and Warranties**.  Maker hereby represents and warrants to Holder, as of the date hereof, the following:

(a)    **No Conflict**.  Maker has the right, power and lawful authority to issue, execute and deliver this Note. The execution and delivery of this Note by Maker will not violate any provisions of law, regulation, order of any court or any other agency of government binding on Maker, nor shall this Note violate, breach, conflict with or result in a breach of any of the material terms, conditions or provisions of any agreement, obligation or other instrument to which Maker is a party, or by which Maker may be bound.

(b)    **Validity of Instrument**.  This Note constitutes the legal, valid and binding obligation of Maker enforceable against Maker in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or equitable principles relating to or limiting creditors' rights generally.

20.    IN CONSIDERATION OF THE AGREEMENTS CONTAINED HEREIN, TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE MAKER HEREBY WAIVES ANY PROVISIONS APPLICABLE IN CONNECTION WITH ANY VOLUNTARY OR INVOLUNTARY INSOLVENCY, BANKRUPTCY, REORGANIZATION, FRAUDULENT CONVEYANCE, OR SIMILAR PROCEEDING INVOLVING THE MAKER (OR OTHERWISE AFFECTING THE COLLATERAL GIVEN TO THE HOLDER TO SECURE THIS NOTE) UNDER ANY STATE OR FEDERAL LAW REGARDING CREDITORS' RIGHTS OR DEBTORS' OBLIGATIONS IMPOSING AGAINST THE HOLDER, OR OTHERWISE PROVIDING FOR, AN AUTOMATIC STAY UNDER SECTION 362(A) OF THE BANKRUPTCY CODE OR ANY OTHER PROHIBITION AGAINST THE HOLDER'S COMMENCING, MAINTAINING, OR COMPLETING ANY PROCEEDINGS IN CONNECTION WITH OR THE EXERCISE OR ENFORCEMENT OF ANY OF THE HOLDER'S RIGHTS HEREUNDER OR ANY APPLICABLE LAW.  IN FURTHERANCE THEREOF, THE MAKER AGREES (i) THAT, IN THE EVENT OF THE IMPOSITION OF ANY SUCH STAY OR OTHER PROHIBITION, THE HOLDER MAY SEEK TO LIFT ANY SUCH STAY OR OTHER PROHIBITION OR SEEK EXEMPTION THEREFROM, (ii) NOT

TO CONTEST ANY MOTION MADE BY THE HOLDER FOR THE LIFTING THEREOF OR FOR EXEMPTION THEREFROM; AND (iii) TO COOPERATE WITH THE HOLDER, IN ANY MANNER REQUESTED BY THE HOLDER, IN ITS EFFORTS TO OBTAIN RELIEF FROM ANY SUCH STAY OR OTHER PROHIBITION.

6

IN WITNESS WHEREOF, Maker has caused this Note to be duly executed.

**CIRCLE 10 RESTAURANT LLC**
a New Jersey limited liability company

By: _____
Its: _____

"Maker"

Witness: _____

Robert Kurtz.

Dated: October 23, 2010

2387655-03

## Exhibit A

Note Payment Schedule

(See attached.)

2387655-03

Livingston Liquor License Note Pay Down Schedule
To be used as Exhibit A

9.00%

| Month | Beg Principle | Monthly Principal | Monthly Interest | Monthly Payment | End Principal |
|---|---|---|---|---|---|
| | | | | | 500,000.00 |
| 1 | 500,000.00 | $4,294.54 | 3,750.00 | 8,044.54 | 495,705.46 |
| 2 | 495,705.46 | $4,326.75 | 3,717.79 | 8,044.54 | 491,378.71 |
| 3 | 491,378.71 | $4,359.20 | 3,685.34 | 8,044.54 | 487,019.51 |
| 4 | 487,019.51 | $4,391.89 | 3,652.65 | 8,044.54 | 482,627.62 |
| 5 | 482,627.62 | $4,424.83 | 3,619.71 | 8,044.54 | 478,202.79 |
| 6 | 478,202.79 | $4,458.02 | 3,586.52 | 8,044.54 | 473,744.77 |
| 7 | 473,744.77 | $4,491.45 | 3,553.09 | 8,044.54 | 469,253.32 |
| 8 | 469,253.32 | $4,525.14 | 3,519.40 | 8,044.54 | 464,728.18 |
| 9 | 464,728.18 | $4,559.08 | 3,485.46 | 8,044.54 | 460,169.10 |
| 10 | 460,169.10 | $4,593.27 | 3,451.27 | 8,044.54 | 455,575.83 |
| 11 | 455,575.83 | $4,627.72 | 3,416.82 | 8,044.54 | 450,948.11 |
| 12 | 450,948.11 | $4,662.43 | 3,382.11 | 8,044.54 | 446,285.68 |
| 13 | 446,285.68 | $4,697.40 | 3,347.14 | 8,044.54 | 441,588.28 |
| 14 | 441,588.28 | $4,732.63 | 3,311.91 | 8,044.54 | 436,855.66 |
| 15 | 436,855.66 | $4,768.12 | 3,276.42 | 8,044.54 | 432,087.54 |
| 16 | 432,087.54 | $4,803.88 | 3,240.66 | 8,044.54 | 427,283.65 |
| 17 | 427,283.65 | $4,839.91 | 3,204.63 | 8,044.54 | 422,443.74 |
| 18 | 422,443.74 | $4,876.21 | 3,168.33 | 8,044.54 | 417,567.53 |
| 19 | 417,567.53 | $4,912.78 | 3,131.76 | 8,044.54 | 412,654.75 |
| 20 | 412,654.75 | $4,949.63 | 3,094.91 | 8,044.54 | 407,705.12 |
| 21 | 407,705.12 | $4,986.75 | 3,057.79 | 8,044.54 | 402,718.37 |
| 22 | 402,718.37 | $5,024.15 | 3,020.39 | 8,044.54 | 397,694.22 |
| 23 | 397,694.22 | $5,061.83 | 2,982.71 | 8,044.54 | 392,632.38 |
| 24 | 392,632.38 | $5,099.80 | 2,944.74 | 8,044.54 | 387,532.59 |
| 25 | 387,532.59 | $5,138.04 | 2,906.50 | 8,044.54 | 382,394.54 |
| 26 | 382,394.54 | $5,176.58 | 2,867.96 | 8,044.54 | 377,217.96 |
| 27 | 377,217.96 | $5,215.40 | 2,829.14 | 8,044.54 | 372,002.56 |
| 28 | 372,002.56 | $5,254.52 | 2,790.02 | 8,044.54 | 366,748.04 |
| 29 | 366,748.04 | $5,293.93 | 2,750.61 | 8,044.54 | 361,454.11 |
| 30 | 361,454.11 | $5,333.63 | 2,710.91 | 8,044.54 | 356,120.48 |
| 31 | 356,120.48 | $5,373.64 | 2,670.90 | 8,044.54 | 350,746.84 |
| 32 | 350,746.84 | $5,413.94 | 2,630.60 | 8,044.54 | 345,332.90 |
| 33 | 345,332.90 | $5,454.54 | 2,590.00 | 8,044.54 | 339,878.36 |
| 34 | 339,878.36 | $5,495.45 | 2,549.09 | 8,044.54 | 334,382.91 |
| 35 | 334,382.91 | $5,536.67 | 2,507.87 | 8,044.54 | 328,846.24 |
| 36 | 328,846.24 | $5,578.19 | 2,466.35 | 8,044.54 | 323,268.05 |
| 37 | 323,268.05 | $5,620.03 | 2,424.51 | 8,044.54 | 317,648.02 |
| 38 | 317,648.02 | $5,662.18 | 2,382.36 | 8,044.54 | 311,985.84 |
| 39 | 311,985.84 | $5,704.65 | 2,339.89 | 8,044.54 | 306,281.20 |
| 40 | 306,281.20 | $5,747.43 | 2,297.11 | 8,044.54 | 300,533.77 |
| 41 | 300,533.77 | $5,790.54 | 2,254.00 | 8,044.54 | 294,743.23 |
| 42 | 294,743.23 | $5,833.96 | 2,210.58 | 8,044.54 | 288,909.27 |
| 43 | 288,909.27 | $5,877.72 | 2,166.82 | 8,044.54 | 283,031.55 |
| 44 | 283,031.55 | $5,921.80 | 2,122.74 | 8,044.54 | 277,109.74 |
| 45 | 277,109.74 | $5,966.22 | 2,078.32 | 8,044.54 | 271,143.53 |
| 46 | 271,143.53 | $6,010.96 | 2,033.58 | 8,044.54 | 265,132.57 |

| | | | | |
|---|---|---|---|---|
| 47 | 265,132.57 | $6,056.04 | 1,988.50 | 8,044.54 | 259,076.52 |
| 48 | 259,076.52 | $6,101.47 | 1,943.07 | 8,044.54 | 252,975.06 |
| 49 | 252,975.06 | $6,147.23 | 1,897.31 | 8,044.54 | 246,827.83 |
| 50 | 246,827.83 | $6,193.33 | 1,851.21 | 8,044.54 | 240,634.50 |
| 51 | 240,634.50 | $6,239.78 | 1,804.76 | 8,044.54 | 234,394.72 |
| 52 | 234,394.72 | $6,286.58 | 1,757.96 | 8,044.54 | 228,108.14 |
| 53 | 228,108.14 | $6,333.73 | 1,710.81 | 8,044.54 | 221,774.41 |
| 54 | 221,774.41 | $6,381.23 | 1,663.31 | 8,044.54 | 215,393.18 |
| 55 | 215,393.18 | $6,429.09 | 1,615.45 | 8,044.54 | 208,964.09 |
| 56 | 208,964.09 | $6,477.31 | 1,567.23 | 8,044.54 | 202,486.78 |
| 57 | 202,486.78 | $6,525.89 | 1,518.65 | 8,044.54 | 195,960.89 |
| 58 | 195,960.89 | $6,574.83 | 1,469.71 | 8,044.54 | 189,386.06 |
| 59 | 189,386.06 | $6,624.14 | 1,420.40 | 8,044.54 | 182,761.92 |
| 60 | 182,761.92 | $6,673.82 | 1,370.72 | 8,044.54 | 176,088.09 |
| 61 | 176,088.09 | $6,723.88 | 1,320.66 | 8,044.54 | 169,364.21 |
| 62 | 169,364.21 | $6,774.31 | 1,270.23 | 8,044.54 | 162,589.91 |
| 63 | 162,589.91 | $6,825.11 | 1,219.43 | 8,044.54 | 155,764.79 |
| 64 | 155,764.79 | $6,876.30 | 1,168.24 | 8,044.54 | 148,888.49 |
| 65 | 148,888.49 | $6,927.88 | 1,116.66 | 8,044.54 | 141,960.61 |
| 66 | 141,960.61 | $6,979.83 | 1,064.71 | 8,044.54 | 134,980.78 |
| 67 | 134,980.78 | $7,032.18 | 1,012.36 | 8,044.54 | 127,948.60 |
| 68 | 127,948.60 | $7,084.92 | 959.62 | 8,044.54 | 120,863.67 |
| 69 | 120,863.67 | $7,138.06 | 906.48 | 8,044.54 | 113,725.61 |
| 70 | 113,725.61 | $7,191.60 | 852.94 | 8,044.54 | 106,534.01 |
| 71 | 106,534.01 | $7,245.53 | 799.01 | 8,044.54 | 99,288.48 |
| 72 | 99,288.48 | $7,299.88 | 744.66 | 8,044.54 | 91,988.60 |
| 73 | 91,988.60 | $7,354.62 | 689.92 | 8,044.54 | 84,633.98 |
| 74 | 84,633.98 | $7,409.78 | 634.76 | 8,044.54 | 77,224.19 |
| 75 | 77,224.19 | $7,465.36 | 579.18 | 8,044.54 | 69,758.84 |
| 76 | 69,758.84 | $7,521.35 | 523.19 | 8,044.54 | 62,237.49 |
| 77 | 62,237.49 | $7,577.76 | 466.78 | 8,044.54 | 54,659.73 |
| 78 | 54,659.73 | $7,634.59 | 409.95 | 8,044.54 | 47,025.14 |
| 79 | 47,025.14 | $7,691.85 | 352.69 | 8,044.54 | 39,333.29 |
| 80 | 39,333.29 | $7,749.54 | 295.00 | 8,044.54 | 31,583.75 |
| 81 | 31,583.75 | $7,807.66 | 236.88 | 8,044.54 | 23,776.09 |
| 82 | 23,776.09 | $7,866.22 | 178.32 | 8,044.54 | 15,909.87 |
| 83 | 15,909.87 | $7,925.22 | 119.32 | 8,044.54 | 7,984.65 |
| 84 | 7,984.65 | $7,984.65 | 59.97 | 8,044.62 | 0.00 |

# Exhibit C

## RIGHT OF FIRST REFUSAL AGREEMENT

THIS RIGHT OF FIRST REFUSAL AGREEMENT (this "Agreement") is dated as of the 20th day of October, 2010, between Lim Chew Corp., a New Jersey corporation, with an address of 276 Eisenhower Parkway, Livingston, New Jersey 07039 ("Buyer"), and Circle 10 Restaurant LLC, a New Jersey limited liability company, with an address of 8 Tarlton Drive, Livingston, NJ 07039 ("Seller").

WHEREAS, Seller is the prospective transferee of a New Jersey Alcoholic Beverage Retail Consumption Liquor License issued by the Township of Livingston, Essex County, New Jersey and presently designated as License No. 0710 - 33 - 020 – 005 (the "License"), which License Seller intends to utilize at its restaurant to be located at Block 600 Lot 1 of the Tax Map of the Township of Livingston, commonly known as 372 W. Mt. Pleasant Avenue, Livingston, New Jersey 07039 (the "Premises") under an executed Lease dated October 20, 2010 (the "Lease") by and between Buyer, as Landlord, and Seller, as Tenant; and

WHEREAS, Seller desires to grant to Buyer a right of first refusal to purchase the License on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid by Seller and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    If, at any time following the date that the License is transferred to Seller: (i) Seller offers to sell the License to a third party (other than to a Permitted Assignee as defined in Section 11 herein), (ii) shall receive an offer following bona fide arms length negotiations from a ready, willing and able unrelated third party to purchase the License which offer (whether made by or to Seller) Seller desires to accept (any event described in (i) or (ii) above, an "Offer"), or (iii) the Term of the Lease (as defined therein) expires or the Lease is terminated for any reason (any event described in (i), (ii), or (iii) above, a "Triggering Event"), Seller shall notify Buyer in writing ("Seller's Notice") of the Triggering Event (the "Proposal"). In the event the Proposal is in connection with an event described in (i) or (ii) above, the Proposal shall be evidenced by a letter of intent executed by Seller and the prospective purchaser (the "PP"), and shall contain the proposed purchase price (the "Third Party Offer Price"), the closing date and any other material terms of the Offer.

2.    Buyer shall have the right (the "Refusal Right"), within fifteen (15) business days of the receipt of Seller's Notice, to notify Seller in writing ("Buyer's Notice") that it desires to purchase the License. In the event that Buyer so elects to exercise the Refusal Right, the sole consideration payable by Buyer for the License shall be an amount equal to the lesser of: (x) the Third Party Offer Price (if any), (y) the sum of (A) $100,000.00, and (B) the original principal amount payable under that certain Promissory Note with Seller, as Maker, and Buyer, as Holder, delivered by Seller to Buyer in consideration for its acquisition of the License (the "Note"), and (z) the sum of (C) $100,000.00, and (D) the total principal payments made by Seller under the Note through the date of the transfer of the License pursuant to this Agreement to Buyer or its assignee or nominee (the lesser of (x), (y), and (z) being the "Purchase Price"). The Purchase

Price shall be payable to Seller upon receipt of all final governmental approvals and consents to the transfer of the License to Buyer or its assignee or nominee. Buyer and Seller expressly acknowledge and agree that for purposes of calculating the amount in (z) above, the portion of each monthly payment made under the Note constituting principal shall be as set forth on Exhibit A to the Note, prorated for any partial payment. Seller shall cooperate with Buyer and/or its assignee or nominee in complying with the regulatory or governmental procedures or requirements reasonably necessary in connection with the transfer of the License in order to accomplish such transfer as expeditiously as possible. Notwithstanding anything contained in this Agreement to the contrary, the Refusal Right shall not apply to any transfer of the License by Seller to a Permitted Assignee (as defined below) provided that the Lease remains in effect, the License remains sited at the Premises and the Permitted Assignee has assumed the obligations of Seller hereunder and as tenant under the Lease.

3.      If, following Buyer's failure to exercise its Refusal Right arising from an Offer, the transfer of the License to the applicable PP on the terms set forth in the Offer is not consummated for any reason within 180 days from the last date on which Buyer could have provided Seller the Buyer's Notice with respect to such proposed transfer, Seller's right to transfer the License pursuant to such Offer shall expire and Seller shall provide Buyer with written notice of the failure to consummate the transfer to the PP. Until such time as a transfer to a PP is consummated as permitted hereunder, Buyer's Refusal Right arising from any Triggering Event and the terms and provisions of this Agreement shall remain in full force and effect.

4.      Any notice to be given under this Agreement shall be delivered in person or sent by United States certified mail, return receipt requested, postage prepaid, or by any overnight or express mail service that provides receipts to indicate delivery, and shall be addressed to the addressee at the address set forth above or at such other address as has been designated by written notice given as provided herein. All notices sent as provided above shall be effective upon receipt or refusal of delivery. Either party may change their notice address by providing prior written notice to the other party.

5.      In the event that Seller defaults hereunder, and such default is not cured by Seller within thirty (30) days or such lesser period of time if Buyer's rights hereunder are threatened (an "Event of Default"), Buyer shall have and may elect to exercise any and all rights or remedies available to it at law or in equity including, without limitation, the right to specifically enforce this Agreement and/or to recover any damages, losses, costs and expenses of Buyer arising from Seller's default.

6.      Once properly executed by all parties, this Agreement shall only be amended by a written agreement signed by the parties hereto. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their successors and assigns. It is agreed and understood that there will be no binding agreement unless the Seller and Buyer each executes this Agreement. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey.

7.      Each term and each provision of this Agreement to be performed by Seller shall be construed to be both an independent covenant and a condition. If any term, covenant or

2

condition of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Agreement shall be valid and be enforced to the fullest extent permitted by law. In addition, the Buyer may pursue the relief or remedy sought in any invalid clause by conforming the said clause with the provisions of the statutes or the regulations of any governmental agency in such case made and provided as if the particular provisions of the applicable statutes or regulations were set forth herein at length. Nothing contained in this Agreement shall be construed as limiting or negating any of Buyer's rights and remedies under the Lease, including, without limitation, upon an Event of Default under the Lease (as defined therein), and no action, inaction or election by Buyer under this Agreement shall be deemed to affect or alter the rights of Buyer, as landlord, under the Lease.

8.     The failure of the Seller or Buyer to insist upon strict performance of any of the covenants or conditions of this Agreement shall not be construed as a waiver by such party of any of its rights or remedies under this Agreement, and shall not be construed as a waiver, relinquishment or failure of any such covenants, conditions, or options.

9.     This Agreement may be signed in more than one counterpart, each of which shall constitute an original but all of which together shall constitute one and the same Agreement.

10.     This Agreement shall be effective on the date that the License is transferred to Seller ("Effective Date").

11.     Seller may not assign this Agreement without the prior written consent of Buyer except to the following permitted assignees: (a) a parent or subsidiary or an affiliate controlled by, or under common control with, Seller to which the Lease is assigned in accordance with the terms of the Lease and as permitted thereunder; (b) any person or entity to which the Lease is assigned or sublet pursuant to the terms of the Lease in conjunction with an assignment or sublease of the Premises in accordance with the terms of the Lease and as permitted thereunder; provided, however, any such assignee under the foregoing clauses (a) and (b) must, prior to or simultaneously with such assignment, assume in writing the obligations under this Agreement, must be eligible to hold a liquor license in the State of New Jersey and must comply with any and all laws, rules and regulations governing the License including those relating to its transfer (the "Permitted Assignees"). Notwithstanding anything contained in this Agreement to the contrary, the Refusal Right shall not apply to any transfer of the License by Seller to a Permitted Assignee provided that the Lease remains in effect, the License remains sited at the Premises and the Permitted Assignee has assumed the obligations of Seller hereunder and as tenant under the Lease.

12.     Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby.

3

13.    Buyer does not, in any way or for any purpose, become a partner of Seller in the conduct of its business, or otherwise, or joint venturer or a member of a joint enterprise with Seller whatsoever, or become a principal or agent of Seller. It is expressly understood and agreed that no provision contained in this Agreement nor any act or acts of the parties hereto shall be deemed to create any such relationship between Seller and Buyer.

*[signatures on following page]*

4

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

BUYER:
Lim Chew Corp.

By: _____
     Name:  MEE YUN W LAM
     Title:  PRESIDENT

SELLER:
Circle 1Q Restaurant LLC

By: _____
     Name:  Robert Kurk
     Title:  managing member

     managing member